GRELCK CONDENSED BUTTERMILK CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 3691.   Promulgated May 25, 1927.

1. LICENSE FOR USE OF PATENT.—Value of a certain license for the use of patents, paid in for stock of a corporation, for the purposes of invested capital and exhaustion deduction determined.

2. BUILDINGS AND EQUIPMENT.—The value of certain buildings and operating equipment for a part of which stock was issued determined for the purposes of invested capital and exhaustion deduction.

3. PATENT LITIGATION.—An amount advanced by a patent licensee toward the payment of cost of patent litigation *held* not to be a deduction as ordinary and necessary expense.

*Milton B. Firestone, Esq.,* and *Maurice W. Stoffer, Esq.,* for the petitioner.

*A. H. Fast, Esq.,* for the respondent.

A statutory deficiency letter issued February 25, 1925, to the above-named petitioner asserted a deficiency in income and profits taxes for the calendar year 1919 in the amount of $1,343.94. In arriving at this deficiency the Commissioner eliminated from invested capital $75,000 claimed as the value of a certain patent license paid in for stock and $20,000 of the claimed cost of buildings and

equipment for which stock had been issued. He also disallowed a deduction of $500 claimed as ordinary and necessary business expense. Contending that each of the foregoing acts of the Commissioner were erroneous, the petitioner brings this action.

At the trial counsel for the parties stipulated that inasmuch as the Grelck-Hovey Co. of Nebraska was no longer in existence and the petitioner had acquired all of said company's assets, the amount of the deficiency, if any, should be charged against the petitioner.

### FINDINGS OF FACT.

William P. M. Grelck since 1888 has been a specialist in feeds, a food expert, and a milk engineer. During some time prior to 1917 he developed a process whereby the buttermilk from creameries could be condensed into a semisolid mass to be used as a feed for livestock. Prior to the development of this process creameries discarded buttermilk as a waste product. Under the Grelck process condensed buttermilk becomes a self-preserving lactic acid milk product capable of being reduced to a semisolid mass for packing in water-tight containers.

On June 19, 1917, United States Patent No. 1230479, covering this process was issued to Bertha H. Grelck, wife and assignee of William P. M. Grelck. This is a basic patent and the product was the first of its kind in the milk industry.

On June 11, 1917, Grelck, his wife, and one Hovey, incorporated the Grelck-Hovey Co., under the laws of Nebraska, for the purpose of engaging in the production and the selling of condensed buttermilk.

On June 28, 1917, this company entered into an agreement with Bertha H. Grelck whereby for a consideration of $75,000 in cash, or 750 shares of the common stock, this company secured a license to manufacture and sell condensed buttermilk under said patent during its life. The license secured under this agreement was unlimited but not exclusive. The board of directors of said company placed a value of $75,000 upon the license and authorized the issue of 750 shares of common stock in payment therefor and said 750 shares were issued to Bertha H. Grelck.

The license agreement acquired by the petitioner for stock had a cash value on June 28, 1917, of $30,000.

During 1917, the said company erected manufacturing plants at Duluth, Minn., Grand Forks, N. Dak., and Sioux Falls, S. Dak., which were operated during 1917 and 1918 and more than 100,000 pounds of condensed buttermilk were produced each year. There was an instant market for the product.

William P. M. Grelck was chosen president of the company and his duties were to manage the production and sale of condensed butter-

milk.  He was to receive an agreed salary based upon the volume of business and profits produced.  He was also charged with the superintendence of the erection and equipment of the three manufacturing plants above mentioned.  He superintended and directed all the work of constructing these three plants, made the designs, and directed the construction and installation of all the equipment which became a part of these plants.  The monies actually disbursed by the company in the construction of these plants were $28,200.  Grelck received no part of this amount, but in consideration of his expert services in the construction of the plants and equipment, the company by proper corporate act authorized and issued to him common stock of the par value of $20,000, agreeing that his services as engineer and superintendent of construction were worth the amount of par of said stock.  The three plants were entered upon the books of the company at a total capital cost of $48,200.

The three manufacturing plants at Duluth, Grand Forks, and Sioux Falls with their equipment, upon completion, had cost $35,230.

On February 3, 1919, the petitioner corporation was organized under the laws of Delaware, with the name of Grelck-Hovey Co., with an authorized capital stock of $30,000, divided into shares of a par value of $100 each.  Some time in 1920 petitioner's name was changed to Grelck Condensed Buttermilk Co., and it is hereafter referred to as the petitioner.

On February 5, 1919, the petitioner, by proper corporate action, entered into a contract with the Grelck-Hovey Co. of Nebraska to purchase from the latter company all of its property for the sum of $123,200, and to issue stock therefor as provided by the contract.  In pursuance of this contract the petitioner acquired all of the property of the Grelck-Hovey Co. of Nebraska, including equipment, machinery, and the plants at Duluth, Grand Forks, and Sioux Falls, and all its rights and licenses to manufacture condensed buttermilk and issued its stock in payment therefor in the amount of $123,200, and set up said assets on its books as follows:

| | |
|---|---|
| Plant and equipment | $48, 200 |
| License | 75, 000 |
| Total | 123, 200 |

The stock was issued to the same persons who held the stock of Grelck-Hovey Co. of Nebraska as follows:

| | Shares. |
|---|---|
| William P. M. Grelck | 232 |
| Bertha Grelck | 750 |
| E. P. Hovey | 250 |
| Total | 1, 232 |

Upon acquiring the plants and equipment the petitioner immediately began the production of condensed buttermilk. There was an immediate and large demand for this product and today there are several million pounds produced yearly. The petitioner company, however, did not prosper, due to the fact that creameries which produced their own raw buttermilk without cost began generally to infringe upon the patent rights or to produce a similar product by processes sufficiently modified to escape infringement.

The petitioner, however, prior to August, 1923, acquired three other manufacturing plants, and, on August 1, 1923, was the owner of six plants for the production of condensed buttermilk.

Prior to July 9, 1918, Grelck produced another related invention, for which on July 9, 1918, he secured United States Patent No. 1272035, and prior to August 1, 1923, the ownership of the two patents herein referred to passed to another corporation known as the Grelck-Hovey Patent Co.

On August 1, 1923, the last-named company granted to Albert P. Hunt of Chicago, Ill., license to manufacture and sell products specified in each of said patents for the period of one year and renewable from year to year during the life of said patents. The license granted to Hunt was unlimited and exclusive except as to the rights owned by and to be exercised by the petitioner at its then-existing six plants or other plants which might thereafter be substituted therefor, at no time exceeding six in number, and except that the licensor retained the right to manufacture the products described in patent No. 1272035 at any place in the United States. In consideration of this license Hunt agreed to pay to the licensor the sum of $30,000 per year so long as the license continued in force. Under his license, Hunt has the right to and does operate many plants, and has granted many sublicenses.

During the year 1919, while suits for the infringement of patent No. 1230479 were in progress the petitioner advanced the sum of $500 toward defraying the cost of patent litigation. This amount it charged to expense, although it expected that the amount would be repaid to it and in 1924 it received such repayment.

OPINION.

TRUSSELL: The petitioner corporation, being the successor to and being controlled by the same stockholders as its predecessor the Grelck-Hovey Co. of Nebraska, and having taken over its predecessor's assets for stock, can not, under the provisions of sections 326 and 331 of the Revenue Act of 1918, claim a larger invested capital on account of such assets than could have been claimed by the predecessor corporation.

Concerning the matter of capital value of the license for the use of a patent acquired by the petitioner, the record contains evidence of value which falls into two classes—(1) the judgment of the men who produced patents and who were the owners of the corporation acquiring the license, and (2) the facts relating to a subsequent license agreement respecting the same patent. Neither of these classes of evidence can be rejected as having no probative value. Men having produced a patent and dealing with a corporation of which they are the owners may, not unnaturally, have entertained a too high opinion of its value, but in the transaction of a later license agreement respecting the same patent these same men were dealing with strangers to the property and with men who were about to pay cash for the rights acquired under a license agreement.

In 1923, when the basic patent still had approximately only 11 years to run and the subsequent related patent had approximately 12 years of life, Hunt undertook to pay $30,000 per year for the rights which he acquired under his license agreement. Applying well known formulae of reducing future payments to present value, it may be found that the capital value of the license agreement acquired by Hunt was approximately $200,000. And, while this agreement covered not only the basic patent in which the petitioner has an interest but also a later related patent, we believe the valuation here suggested for the Hunt license can be taken as furnishing the basis for estimating the value of the license obtained by the petitioner at an earlier date. And, considering all the facts disclosed by the record, especially the fact that when the petitioner obtained its rights the same were unlimited, although not exclusive, and that such rights had a period of more than 15 years of the remaining life of the patent, we have arrived at the conclusion that the license rights acquired by the petitioner and paid for by the issuance of stock had a value on June 28, 1917, of $30,000, and that the petitioner is entitled to have the same included in its invested capital at that value, subject to statutory limitations, and to the right to an annual deduction for the exhaustion of that capital value over the remaining life of the patent.

Concerning the property and plant acquired by the petitioner, it appears that said property cost the predecessor corporation $28,200 in cash disbursements plus the value of the services of Grelck rendered in connection with the construction and equipment of the three plants originally built. It appears from the record that these plants were constructed under the personal supervision of Grelck as an expert in the line of business to which the plants were to be dedicated; that in such construction the predecessor corporation by reason of the em-

ployment of Grelck, saved construction costs equivalent to a contractor's profit, which ordinarily is not less than 15 per cent of the cash cost of the construction. It also saved architect's fees for plans and superintendence, which for properties of the size and cost of the properties here under consideration may have been equal to not less than 10 per cent of cash disbursed in the erection of said plants. A contractor's profit at the rate of 15 per cent would have amounted to $4,230 and an architect's fees at 10 per cent would have been $2,820. It appears that it is for these things that the predecessor corporation issued $20,000 of its common capital stock. We are, therefore, of the opinion that these buildings and equipment should be included in invested capital at a total of $35,250, and that the petitioner may claim an annual exhaustion deduction upon that cost.

The $500 paid by petitioner in 1919 was advanced to the owners of the patent here in question to help defray litigation expenses. We regard this as in the nature of a loan and, in view of the fact that it was later repaid, we are of the opinion that it should not have been allowed as an expense deduction in the year 1919.

> *The deficiency may be redetermined in accordance with the foregoing findings of fact and opinion upon 15 days' notice, pursuant to Rule 50, and judgment will be entered in due course.*