OWENS BOTTLE CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 1033. Promulgated November 5, 1927.

1. A taxpayer possessing the sole and exclusive right and license to practice certain inventions and make and use certain machines covered by certain United States letters patent "and any and all patents which may result from the application for patents" recited in the license agreement "for and during the respective terms for which said patents are, or may be granted, in and throughout the United States * * * and use and sell the products of such processes and machines, together with the right to grant to others sublicenses, or other rights under this agreement" is entitled to a deduction for the exhaustion of such license agreement entered into prior to March 1, 1913, equal to its March 1, 1913, value based upon the value of the patents then in existence, prorated over their remaining life.

2. The March 1, 1913, value of a certain license agreement determined.

*Lloyd T. Williams, Esq., Walter A. Eversman, Esq.,* and *H. A. Mihills, C. P. A.,* for the petitioner.
*Brice Toole, Esq.,* and *Granville S. Borden, Esq.,* for the respondent.

This is a proceeding for the redetermination of a deficiency in income and profits tax for the fiscal year ended September 30, 1917, and for the three-month period ended December 31, 1917, in the amount of $29,772.12.

In its original returns for the taxable periods in question the petitioner claimed no deduction from gross income in respect of the exhaustion of a certain license agreement hereafter referred to. The Commissioner determined that an additional tax was due for the fiscal year ended September 30, 1917, and assessed the same in March, 1924, without complying with section 250(d) of the Revenue Act of 1921. No additional tax was assessed and no deficiency was determined by the Commissioner for the three-month period ended December 31, 1917. The petitioner filed a claim in abatement, which was allowed in part by the Commissioner in a letter addressed to the petitioner on October 15, 1924. No question is raised by the Commissioner as to the jurisdiction of the Board to consider the appeal so far as it relates to the 12-month period ended September 30, 1917, under section 283(f) of the Revenue Act of 1926. The Board has no jurisdiction with respect to the 3-month period above referred to. Section 274(g) of the Revenue Act of 1926.

In this proceeding four issues are raised by the pleadings. The first relates to the petitioner's right to a deduction for exhaustion of a license agreement to practice certain patent inventions acquired

prior to March 1, 1913, and to a deduction for the exhaustion of 2 patents acquired since March 1, 1913, but prior to October 1, 1916.

The second issue relates to the March 1, 1913, value of 883 shares of capital stock of the Charles Boldt Co., which were owned by the petitioner and sold during the taxable year 1917. The parties have filed a stipulation fixing the March 1, 1913, fair market value of the stock at $975.13 per share. The figure stated should be used as the basis for final computation.

The third issue relates to the actual cash value for invested capital purposes of the assets of the American Bottle Co. when acquired by the petitioner on February 29, 1916. This issue has been settled by the petitioner's acquiescence in the Commissioner's determination.

The fourth issue has also been settled by the Commissioner admitting that a double deduction of an item of $500,000 has been made from petitioner's invested capital for 1917.

In the first issue the question is, whether the petitioner is entitled to a deduction of any amount for the fiscal year ended September 30, 1917, for the exhaustion of a certain license agreement and, if so, the question of the March 1, 1913, value of such agreement.

### FINDINGS OF FACT.

(1) The petitioner is an Ohio corporation with its principal office at Toledo. It was organized on December 13, 1907, as the Owens Bottle-Machine Co., and changed its corporate name to its present name, the Owens Bottle Co., on May 1, 1919.

(2) At the time of its organization the petitioner acquired the assets and business of a corporation of like name organized under the laws of the State of New Jersey. Among such assets was a certain license and agreement, dated October 16, 1903, from the Toledo Glass Co., and certain sublicenses granted thereunder, which agreement and sublicenses are hereinafter more specifically referred to.

(3) Since its organization in 1907 the petitioner has been engaged in the manufacture and sale of glass bottles and jars made on certain patented machines known as the " Owens Bottle-Blowing Machines," and has also licensed other manufacturers to use these machines in the manufacture of certain classes of bottles upon the payment of certain stipulated royalties, all of which rights to use said machines and to license the use of the same were acquired under the agreement of October 16, 1903.

(4) In 1898 M. J. Owens began experimenting with machines for the automatic manufacture of glass bottles. Previous to that time bottles had always been made by hand and blown by human lung power. In 1903 these experiments had progressed to the extent that

machines were built which could make in commercial quantities certain classes of bottles automatically.

(5) Application for letters patent of the United States were made by Owens on the inventions involved in his machines and these were by him assigned to the Toledo Glass Co., an Ohio corporation which had financed his experiments. Certain applications for patents made by others were purchased by the Toledo Glass Co.

(6) On September 3, 1903, the Owens Bottle-Machine Co., the New Jersey corporation, was organized with an authorized capital stock of $500,000 par value of preferred stock and $2,500,000 par value of common stock. On October 16, 1903, the Owens Bottle-Machine Co. entered into a license and agreement dated October 16, 1903, hereinbefore referred to, which provided as follows:

LICENSE AND AGREEMENT

between

THE TOLEDO GLASS COMPANY

and

OWENS BOTTLE-MACHINE COMPANY

The Toledo Glass Company, a corporation organized and existing under the laws of the State of Ohio, and having its principal office at Toledo, in said State, first party hereto, being the owner of certain letters patent, and of certain inventions described in applications for letters patent, of the United States of America, for and in glass making machinery and processes, more fully hereinafter enumerated; and Owens Bottle-Machine Company, a corporation organized and existing under the laws of the State of New Jersey, and having its principal office at Jersey City in said State, second party hereto, desiring to obtain an exclusive right and license under said patents and applications, and also under other patents which may hereafter become the property of said first party, for use, in and throughout the United States of America, in the manufacture of bottles and jars of all kinds, and of parts therefor, and for no other purposes or uses;

Now THESE PRESENTS WITNESS:

That said first party, for and in consideration of the sum of twenty-eight hundred thousand dollars to it in hand paid by the said second party, the receipt whereof is hereby acknowledged, hereby grants to the said second party, its successors and assigns, the sole and exclusive right and license to practice the inventions set forth in, and to make and use the machines covered by, the following United States Letters Patent, and any and all patents which may result from the applications for patents hereinafter recited, for and during the respective terms for which said patents are, or may be granted, in and throughout the United States of America, but not elsewhere, but only for use in the manufacture of glass bottles and jars of all kinds, and of parts therefor, and for no other uses or purposes, and to use and sell the products of such processes and machines, together with the right to grant to others sub-licenses, or other rights under this agreement, to-wit:

United States Letters Patent No. 567,236, dated September 8th, 1896, to Hirman Hilde, Méans for Working Glass, and

The following applications for United States Letters Patent:

| | | | | |
|---|---|---|---|---|
| 1. M. J. Owens | | No. | 741,596, | Filed December 26, 1899, Method of Blowing Glass. |
| 2. | " | | " 741,595, | Filed December 26, 1899, Machine for Shaping Glass. |
| 3. | " | | " 152,388, | Filed April 13, 1903, Glass shaping machine. |
| 4. | " | | " 135,555, | Filed December 2, 1902, Glass tank or pot. |
| 5. Wm. Emil Bock | | | " 40,006, | Filed December 15, 1900, Machine for forming parisons for glass-blowing. |
| 6. | " | | " 152,437, | Filed April 13, 1903, Glass shaping machine. |
| 7. Julius Proeger | | | " 711,475, | Filed April 3, 1899, Method of and apparatus for making hollow glass articles. |
| 8. | " | | " 101,175, | Filed April 1, 1902, Manufacture of glassware. |
| 9. | " | | " 17,527, | Filed May 22, 1900, Apparatus for manufacture of glassware. |
| 10. | " | | " 107,659, | Filed May 16, 1902, Machine for making glassware. |
| 11. | " | | " 90,914, | Filed January 23, 1902, Apparatus for the manufacture of glassware. |
| 12. John J. Power | | | " 12,279, | Filed April 10, 1900, Apparatus for manufacture of glassware. |
| 13. | " | | " 12,278, | Filed April 10, 1900, Apparatus for manufacture of glassware. |
| 14. | " | | " 12,280, | Filed April 10, 1900, Manufacture of glassware. |
| 15. | " | | " 49,429, | Filed March 1, 1901, Manufacture of glassware. |

And also a similar license under, and for the full term of, any and all other letters patent of the United States for or relating to blowing methods, glass-blowing machinery and the preparation of glass therefor, which, during the seventeen (17) years next following the date hereof, said first party may acquire or become entitled to, in so far as such patents relate to, or are applicable to, and only for use in, the manufacture of glass bottles or jars or parts therefor.

The grant hereby made is, nevertheless, upon condition that said second party, the successors, assigns and licensees, shall not use or employ, in or about the manufacture of any articles whatever other than glass bottles and jars and parts therefor, any of the inventions or improvements described in any letters patent or applications therefor, under which any license or permit is or shall be granted by said first party to said second party or to its successors or assigns.

The right to practice all such inventions and to make and use all such machines, for all purposes other than the manufacture of glass bottles, jars, and parts therefor, and to grant to others rights in respect thereto, is retained by said first party, which also retains the right to manufacture, within the United States, for use in any foreign country, and for the purposes of experi-

menting with, and developing and improving the same, and exhibiting their operation, such machines for the manufacture of glass bottles and jars and parts therefor.

In further consideration of the premises and of the respective agreements herein contained, said parties hereto hereby severally agree, each with the other, as follows:

1. Said first party will, at its own cost and expense, defend any and all actions and suits which may be brought against said second party, its assigns or licensees, upon claims of infringement of patents owned by others by the use or ownership of methods or machines containing any invention specified in the patent or in any of the applications for patents hereinbefore enumerated, and may, at its option, defend any like actions or suits alleging infringement by the use of methods or machines specified in any patents or applications for patents which may be hereafter acquired by it. Should it elect not to defend any such last mentioned action or suit, it will so notify said second party, which may then, at its own cost and expense, defend the same.

2. Each party hereto and its successors will immediately notify the other and the successors of any and all infringements by others of any letters patent under which a license hereby is, or, pursuant to the provisions hereof, shall be, granted, and also of all actions and suits, in respect to any of said patents or to any other patents, which may at any time be brought by or against it or its successors or licensees or any of them.

3. Said second party will, at its own cost and expense, prosecute any and all infringements of any patents, whether heretofore or hereafter issued or applied for, under which a license is, or, pursuant to the provisions hereof, shall be, granted, so far as such infringements affect or relate to the use of any of said inventions in the manufacture of glass bottles or jars of any kind, or parts therefor, provided that if for thirty days after written request by said first party so to do, said second party shall fail to begin proper action or suit to suppress any such infringement, or shall not promptly, diligently and effectively prosecute any such action or suit, then, and in every such case, said first party may prosecute the same at the cost and expense of the second party.

4. Actions and suits to suppress infringements by those manufacturing both articles which said second party is authorized to manufacture and also articles which it is not so authorized to manufacture shall be brought and diligently and effectively prosecuted by said second party, and in case of its failure for thirty days after written request by said first party so to do, said first party may bring any such action or suit, or may assume and thenceforward conduct any pending action or suit; and said second party will, whenever and so often as requested, pay one-half the cost and expense thereof.

5. The party undertaking, as hereinbefore provided, the prosecution or defense of any action or suit, hereinbefore specified, may conduct the same in the name of the other party hereto or its successors, or otherwise as it may elect. And said other party will, and its successors, assigns and licensees shall, on reasonable request, aid therein by signing any and all proper pleadings and other papers and by all other proper means.

6. Said second party will, and its successors, assigns and licensees shall, at any and all times, upon request, afford to any person duly authorized by said first party, its successors and assigns, access to any and all factories owned, operated or controlled by said second party, its successors, assigns or licensees, and will afford such person all proper facilities for ascertaining and reporting to said first party, its successors and assgins, all work performed and products produced by the use, or with the aid of any of said improvements, or inventions.

7. Said second party will, at any and all convenient times, upon the reasonable request of said first party, conduct for said first party, or allow said first party to conduct, in any and all factories or shops owned, operated or controlled by the second party, any and all experiments desired by it relating to the manufacture of glass bottles or jars, of any kind, or any parts thereof, said first party paying the cost of all such work; and the officers of said first party, or their duly authorized representatives, shall at all reasonable times, have free access to the factories and shops, owned, operated or controlled by said second party, its successors, assigns or licensees.

8. Said first party and its successors will, upon reasonable request of said second party, its successors and assigns, from time to time execute and deliver to it or them all such further grants and licenses as may be necessary or proper to effectuate the grants hereby made, or contracted or intended to be made, or for more conveniently evidencing the same.

9. In further consideration of the said license and of the premises, said second party covenants to, and agrees with, said first party, that it will, and its successors and assigns shall, faithfully keep and perform each and every of the covenants and agreements aforesaid, on its part to be kept and performed.

(7) On November 1, 1904, the Owens Bottle-Machine Co. granted a sublicense to the Owens Bottle Co., which was subsequently assigned to the American Bottle Co. for the manufacturing of malted and carbonated beverage bottles, such as bottles for beer, ale, soda water, etc., and on September 16, 1904, it granted a sublicense to Baldwin-Travis Co., which was subsequently assigned to the Thatcher Manufacturing Co., for the manufacture of milk bottles and milk jars.

(8) The Owens Bottle-Machine Co., the New Jersey corporation, assigned to the petitioner on December 17, 1907, all its properties, rights and assets of every kind, nature and description except only its cash on hand amounting to $33,120, for $2,964,000, payable $300,000 in money, $464,000 in preferred stock of the petitioner at par, and $2,200,000 in common stock of petitioner at par, the petitioner assuming and undertaking to pay all and every lawful liability of the Owens Bottle-Machine Co. and to pay all costs and expenses of its dissolution.

(9) Until 1907 the Owens machine could make commercially and successfully only the heavy, coarse bottles such as described in the preceding sublicense, but by 1909 the machines were so improved that they could manufacture commercially and successfully lighter and higher-grade bottles of all kinds. In the period from 1909 to 1913, inclusive, the taxpayer issued sublicenses for the use of the Owens bottle-blowing machine as follows:

(1) To *Hazel-Atlas Glass Company*, for the manufacture of certain wide mouth and semi-wide mouth bottles and jars;

(2) To *H. J. Heinz Company*, for the manufacture of bottles used for Heinz food products;

(3) To *Greenfield Fruit Jar & Bottle Company*, subsequently assigned to Ball Brothers Manufacturing Company, for the manufacture of fruit jars;

(4) To *Whitney Glass Works*, for the manufacture of bottles for prescriptions, proprietary medicines, and the product of manufacturing chemists;

(5) To *Hazel-Atlas Glass Company*, for the manufacture of certain round, narrow neck ink bottles of half pint, pint and quart sizes;

(6) To *Illinois Glass Company* and *The Charles Boldt Company*, jointly, for the manufacture of liquor ware;

(7) To *Owens-West Virginia Bottle Company*, for the manufacture of brandy bottles, liquor ovals and distillers' flasks in certain limited quantities;

(8) To *Illinois Glass Company*, for the manufacture of bottles for the products of manufacturing chemists and patent and proprietary medicines and preparations and for druggists' use;

(9) To *D. C. Jenkins Glass Company*, for the manufacture of certain fish globes, table jars, display jars, jugs, molasses jars, lamps, lamp founts and table ware;

(10) To *Maryland Glass Corporation*, for the manufacture of certain bottles made from blue glass.

All of the above sublicenses, including the two sublicenses granted by the New Jersey corporation, were granted upon the condition that the sublicensees should pay to the petitioner in money, periodically, royalties based either upon the number of gross or upon the weight of merchantable bottles manufactured by them. All of the sublicenses provided that the petitioner should furnish the necessary machines and repair parts therefor for the several sublicensees upon payment by them respectively of the cost to petitioner of procuring such machines and parts to be manufactured, plus 10 per cent.

(10) The sublicenses in general were to be in force and effect as long as the petitioner's license from the Toledo Glass Co. was in effect. The sublicense agreement, dated June 5, 1909, to the H. J. Heinz Co., provided in paragraph 4 as follows:

Said license shall be for the full term of any and all Letters Patent of the United States issued and to be issued for improvements, inventions, processes, and methods now embodied or contained in such machines or other things. So long as said license shall remain in force, the right to have included therein any improvement, invention, process, or method which shall be hereafter made or acquired by said Owens Company, or the right to use, in the manufacture of such bottles or jars, shall be hereafter acquired by it, shall be by said Owens Company offered in writing to said Heinz Company and if, within thirty days after the making of any such offer, said Heinz Company shall give said Owens Company written notice of its acceptance thereof, the same shall thereby become included in said license, which shall thereby be extended for and throughout the full term of any Letters Patent of the United States which then shall have been or thereafter shall be issued for any such improvement, invention, process, or method; otherwise said Heinz Company shall be deemed to have declined the same and to have no right to the use thereof; provided, however, that said Heinz Company may at any time upon surrendering to said Owens Company all machines and other things furnished to it by said Owens Company or embodying or containing any of the devices or processes in respect of which such license is granted, and upon paying the full amount of all accrued royalties or license fees, wholly terminate such license.

The sublicense agreement dated December 31, 1909, to the Whitney Glass Works provided substantially the same as the sublicense agreement to the H. J. Heinz Co., and provided in part " that the said licensee may at its election, at any time, upon surrendering to said licensor all machines and other things furnished to it by said licensor or embodying or containing any of the devices or processes in respect of· which this license is granted and upon paying all the full amount of accrued license fees, wholly terminate this license."

(11) The sublicense to the Maryland Glass Corporation for the manufacture of certain bottles made from blue glass was granted in 1913, but subsequent to March 1. The narrow-necked glass bottle field had been covered by sublicenses to manufacturers at the close of 1913 except for the purposes of making narrow-necked condiment bottles and a small specific line of prescription and proprietary ware. The petitioner reserved this field to itself and refused to sublicense any manufacturer with respect to these lines of ware.

(12) On March 1, 1913, the Owens machine was the only one known in the trade by which the glass was gathered automatically and then subsequently made automatically into a bottle. The patents, rights under which were granted by the agreement of October 16, 1903, were basic in that they covered a new mode of manufacture and created a new art in the making of bottles. The patents have never been infringed to the knowledge of the petitioner.

(13) The fundamental patents, the rights under which were granted to the petitioner under the agreement of October 16, 1903, their dates of issue and of expiration are, respectively, as follows:

| Description | Issued | Expiration | Description | Issued | Expiration |
|---|---|---|---|---|---|
| *No.* | | | *No.* | | |
| 744006—Proeger | 1903 | Nov. 10, 1920 | 870664—Bock | 1907 | Nov. 12, 1924 |
| 744007—Proeger | 1903 | Nov. 10, 1920 | 852097—Bock | 1907 | Apr. 30, 1924 |
| 744008—Proeger | 1903 | Nov. 10, 1920 | 852098—Bock | 1907 | Apr. 30, 1924 |
| 759742—Owens | 1904 | May 10, 1921 | 852099—Bock | 1907 | Apr. 30, 1924 |
| 766768—Owens | 1904 | Aug. 2, 1921 | 854830—Bock | 1907 | May 28, 1924 |
| 774690—Owens | 1904 | Nov. 8, 1921 | | | |

The most recent of these patents expired November 12, 1924.

(14) The three Owens patents, above referred to, are described as follows:

Patent No. 759742—Owens, was a method patent covering the process of taking molten glass directly from the tank by atmospheric pressure and blowing it into form. This patent covered the whole idea of automatically taking the glass from the tank by atmospheric pressure and at the same time forming the blank to be blown into the completed article. It was one of the most valuable of the Owens' patents because it eliminated the skilled labor required for gathering the molten glass from the tank with the punty rod.

Patent No. 766768—Owens, was on the machine by which the above process was carried out.

Patent No. 774690—Owens, was on a rotary tank for containing the molten glass. The description given in Claim 1 of that patent is as follows:

A tank or holder for a mass of molten glass arranged to expose a portion of the surface of said glass at a dipping-point, in combination with means for bringing fresh portions of the mass of molten glass succcessively to said dipping-point, whereby the chilled glass produced by a dipping operation is carried away from the dipping-point and a fresh portion of the glass brought thereto for the next succeeding dipping operation.

The stationary tank theretofore used had proven unsatisfactory on account of the molten glass becoming chilled and unworkable with the repeated dipping of the mold. The rotary tank brought a new reheated glass surface for each successive dipping of the mold. This invention eliminated the last obstacle in the way of the successful automatic manufacture of bottles.

(15) The Owens machines made better bottles and at lower cost than could be made under the hand-blown process. The bottles were better than the hand-blown bottles in that they excelled in strength and lustre, and were uniform in height, mouth opening and capacity. Bottles could be made on an Owens machine at from 25 to 35 per cent less than when blown by human lung power. Semi-automatic machines, by reason of the large amount of skilled labor employed in their operation, and on account of the inferiority of their product, could not compete successfully with the Owens machines. Bottle factories equipped with Owens machines were operated 24 hours a day, in three shifts of 8 hours each, throughout the year, while under the hand-blown operation it was the custom to work in 2 shifts of 9 hours and to close down completely during the months of July and August.

(16) All of the sublicensees of the petitioner hereinbefore referred to, with the exception of one or two, expanded their respective businesses rapidly after the installation of the Owens machines and by March 1, 1913, were among the largest manufacturers in the United States in the lines of bottles which they, respectively, manufactured.

(17) The royalties paid by the sublicensees beginning in the year 1905 increased steadily so that in 1912 receipts from royalties totaled $993,360.88, and in 1913, $1,031,683.67.

(18) The petitioner began the manufacture of bottles in the unlicensed field in a small way in 1903, but its volume steadily increased and during the calendar year 1912 it produced 535,096 gross of bottles. The number of gross of bottles produced on Owens machines by licensees and the petitioner is shown by the following table:

| Year | Licensees | Owens Co. | Total | Year | Licensees | Owens Co. | Total |
|---|---|---|---|---|---|---|---|
| 1905 | 7,874 | ----- | 7,874 | 1916 | 7,855,465 | 1,569,028 | 9,424,493 |
| 1906 | 233,679 | ----- | 233,679 | 1917 | 8,914,404 | 1,828,699 | 10,743,103 |
| 1907 | 487,527 | ----- | 487,527 | 1918 | 8,232,359 | 2,512,661 | 10,745,020 |
| 1908 | 904,540 | 32,698 | 937,238 | 1919 | 7,497,932 | 2,999,922 | 10,497,854 |
| 1909 | 981,023 | 46,053 | 1,027,076 | 1920 | 9,098,157 | 3,779,605 | 12,877,762 |
| 1910 | 1,761,363 | 65,579 | 1,826,942 | 1921 | 5,364,832 | 1,990,030 | 7,354,862 |
| 1911 | 3,084,029 | 59,701 | 3,143,730 | 1922 | 7,143,097 | 3,148,941 | 10,292,038 |
| 1912 | 3,604,772 | 535,096 | 4,139,868 | 1923 | 8,113,658 | 4,008,647 | 12,122,305 |
| 1913 | 4,413,395 | 815,849 | 5,229,244 | | | | |
| 1914 | 5,760,430 | 900,526 | 6,660,956 | | 89,097,961 | 25,258,204 | 114,356,165 |
| 1915 | 5,630,425 | 965,169 | 6,604,594 | | | | |

(19) The petitioner's income from royalties for the calendar years 1905 to 1922, inclusive, was as follows:

| Calendar year ending Dec. 31— | Licensees. | Calendar year ending Dec. 31—Continued. | Licensees. |
|---|---|---|---|
| 1905 | $4,251.96 | 1915 | 1,131,234.66 |
| 1906 | 127,905.73 | 1916 | 1,433,221.73 |
| 1907 | 264,164.72 | 1917 | 1,725,628.55 |
| 1908 | 431,570.79 | 1918 | 1,283,088.63 |
| 1909 | 553,130.04 | 1919 | 1,201,976.27 |
| 1910 | 587,681.43 | 1920 | 1,361,564.18 |
| 1911 | 841,990.82 | 1921 | 744,230.00 |
| 1912 | 993,360.88 | 1922 | 1,114,793.60 |
| 1913 | 1,031,683.67 | | |
| 1914 | 1,157,580.85 | | 15,989,058.51 |

In addition to its income from royalties it also received from the sale of licenses the following:

For the fiscal year ended September 30, 1905 _____ $500,000
September 30, 1910 _____ 170,000
September 30, 1916 _____ 100,000

(20) The petitioner's balance sheets for the fiscal years ended September 30, 1908, and September 30, 1912, show the following assets and liabilities:

*Year ended September 30, 1908*

ASSETS

| | |
|---|---|
| Patents and inventions | $2,600,000.00 |
| Permanent—Land, buildings, machinery, etc. | 199,423.41 |
| Investments | 116,500.00 |
| Inventory | 111,479.30 |
| Cash | 64,736.28 |
| Notes and accounts receivable | 216,619.48 |
| Deferred | 582.67 |
| | 3,309,341.14 |

LIABILITIES

| | |
|---|---|
| Notes and accounts payable | $154, 145. 34 |
| Accrued expenses | 6, 960. 59 |
| Appropriated surplus | 125, 000. 00 |
| Surplus | 59, 235. 21 |
| Common stock—shares 25,000 | 2, 500, 000. 00 |
| Preferred stock—shares 4,640 | 464, 000. 00 |
| | 3, 309, 341. 14 |

### Year ended September 30, 1912

ASSETS

| | |
|---|---|
| Patents and inventions | $1, 517, 577. 84 |
| Permanent—Land, buildings, equipments, etc | 1, 551, 550. 53 |
| Investments | 1, 370, 815. 00 |
| Inventory | 348, 072. 59 |
| Cash | 101, 873. 95 |
| Notes and accounts receivable | 445, 938. 40 |
| Deferred | 13, 416. 81 |
| | 5, 349, 245. 12 |

LIABILITIES

| | |
|---|---|
| Notes and accounts payable | $681, 902. 13 |
| Accrued expenses | 31, 481. 09 |
| Appropriated surplus | 750, 000. 00 |
| Surplus | 921, 861. 90 |
| Common stock—shares 25,000 | 2, 500, 000. 00 |
| Preferred stock—shares 4,640 | 464, 000. 00 |
| | 5, 349, 245. 12 |

(21) At March 1, 1913, the petitioner's common stock was selling on the open market for $438 per share and the preferred stock for $118 per share. The petitioner had outstanding on that date 37,500 shares of common stock and 5,000 shares of preferred stock. The petitioner's net tangible assets at March 1, 1913, amounted to $3,866,-615.81. The petitioner had no trade-marks, copyrights, brands or trade-names which were used in connection with its business.

(22) During the period from March 1, 1913, to September 30, 1916, the petitioner acquired two additional patents. Patent No. 723983—Brooke, was acquired December 14, 1915, at a cost of $162,500. It expired March 31, 1920. Patent No. 805027—Rawling & Miller, was acquired September 12, 1916, at a cost of $5,015, and expired November 21, 1922. The remaining life of these patents from the date of acquirement was 4.296 years and 6.19 years, respectively.

(23) The petitioner has continued to receive royalties from some of its sublicensees up to the present time.

OPINION.

SMITH: The first question to be decided is whether the petitioner is entitled to any deduction for the fiscal year ended September 30, 1917, on account of the exhaustion of a license agreement of October 16, 1903. It contends that under the provisions of section 12 (a) of the Revenue Act of 1916, as amended by the Revenue Act of 1917, it is entitled to a deduction of an amount equal to such part of the March 1, 1913, value of the license agreement, upon which it claims a value at that date of approximately $13,000,000, as is properly allocable to the taxable period.

The respondent denies that the petitioner is entitled to any deduction on account of the exhaustion of the license agreement in question upon the grounds that the property rights of the petitioner therein did not actually exhaust during the taxable period; that the life of the license agreement was not coexistent with the life of the patents. The respondent further contends that the fair market value of the license agreement at March 1, 1913, was much less than that claimed by the petitioner.

In its brief the respondent divides the rights held by the petitioner at March 1, 1913, under the license agreement, into three groups—(1) the right to receive royalties, (2) the right to use the Owens machines in making certain kinds of bottles, such as had not been transferred to sublicensees, and (3) the right to exclude others from an unauthorized use of its rights in the patents. He contends that neither of these classes of property rights actually exhausted over the taxable period; that the right to receive royalties did not end with the life of the patents but continued so long as the sublicensees used the Owens machines; that the right to use the Owens machines and processes within the United States for the manufacture of certain types of bottles was not affected by the expiration of the patents; and that the right to exclude others from using the Owens machines and processes in the United States was simply evidential of a monopoly which was not conclusively limited to the life of the patents.

We are not impressed with the arguments advanced by the respondent in support of his views. The classification of the rights acquired under the license agreement may be helpful in the matter of valuation of the agreement but it must be borne in mind that it is for the exhaustion of the license agreement itself that the petitioner is claiming a right to the deduction. All the separate rights held by the petitioner at March 1, 1913, grew out of and were incidences of the original license agreement. It is the value of this original license agreement that the petitioner has sought to establish for the purpose of determining the amount deductible from gross

income as exhaustion in its income-tax return for the fiscal year under review.

An inspection of the license agreement above referred to shows that the petitioner obtained—

* * * The sole and exclusive right and license to practice the inventions set forth in, and to make and use the machines covered by, the following United States Letters Patent, and any and all patents which may result from the applications for patents hereinafter recited, *for and during the respective terms for which said patents are, or may be granted,* in and throughout the United States of America, but not elsewhere, but only for use in the manufacture of glass bottles, and jars of all kinds, and of parts therefor, and for no other uses or purposes, and to use and sell the products of such processes and machines, together with the right to grant to others sub-licenses, or other rights under this agreement * * *. (Italics ours.)

It also obtained—

* * * A similar license under, and for the full term of, any and all other letters patent of the United States for or relating to blowing methods, glass-blowing machinery and the preparation of glass therefor, which, during seventeen (17) years next following the date hereof, the said first party may acquire or become entitled to, insofar as such patents relate to, or are applicable to, and only for use in, the manufacture of glass bottles or jars or parts therefor.

The license agreement on its face shows that the petitioner was not to enjoy these privileges in perpetuity. The license agreement was to come to an end at some date in the future. In any event it would end not later than the date of the expiration of any patent then applied for, and with respect to patents thereafter applied for on October 15, 1920. The evidence of record shows that nearly all of the applications for patents listed in the license agreement had been granted prior to March 1, 1913. The last patent which appears to have had any value with respect to the building of the Owens bottle machines was granted on November 12, 1907. Although the construction of the machines was improved thereafter, such construction was based upon the patents granted on or before the last mentioned date. The last patent of value expired on November 12, 1924. We think that any value which the license agreement had as such became exhausted not later than November 12, 1924. The average life of the 11 patents upon which the value of the license agreement of October 16, 1903, is predicated was approximately 9½ years from March 1, 1913, and we therefore fix that period as the one over which the March 1, 1913, value was exhausted.

The question of the rights of a licensee to a deduction for the exhaustion of a license agreement relating to the use of patents was before the Board in *Appeal of Service Recorder Co.*, 2 B. T. A. 96, in which we held that a license for the use of a patent during its life was subject to exhaustion in the same manner as the patent.

In *Appeal of J. M. and M. S. Browning Co.*, 6 B. T. A. 914, the petitioner was allowed a deduction on account of the exhaustion of the right to receive royalties under a license agreement for the use of the patents upon the basis of such right at the time acquired subsequent to 1913, spread ratably over the remaining life of the patents even though there was a possibility of the renewal of the contracts to cover the life of future patents. In *Grelck Condensed Buttermilk Co.*, v. *Commissioner*, 7 B. T. A. 79, it appeared that the license agreement involved permitted the licensee to use certain patents for the production of condensed buttermilk during the life of the patents. We held that the petitioner was entitled to deduct the cost of the license agreement exhausted over the remaining life of the basic patent. In *Appeal of J. J. Gray Jr.*, 2 B. T. A. 672, we held that the March 1, 1913, value of a patent is a proper basis for computing the allowance of the exhaustion of the patent where that value is greater than cost, the patent having been acquired prior to March 1, 1913.

We are convinced from a consideration of all the evidence adduced in this case that the license agreement acquired by the petitioner on October 16, 1903, was of great value at the date acquired and was of still greater value on March 1, 1913. We are also of the opinion that that value, or the major part of it, exhausted during the 9½-year period subsequent to the basic date and that for the taxable period ended September 30, 1917, the petitioner is entitled to deduct from its gross income a reasonable amount for the exhaustion thereof.

The difficult problem in this case is to determine the March 1, 1913, value of the license agreement of October 16, 1903. By March 1, 1913, the petitioner occupied a unique position in the narrow-necked glass-bottle industry. Not only did it have the sole and exclusive right and license to practice the inventions connected with the Owens bottle machines for a period of years, but it also was manufacturing large quantities of bottles itself. Bottles made on the Owens machines were of superior quality to those made by any other method. The Owens machines were fast monopolizing the glass bottle industry. The large manufacturers had been licensed to use the Owens machines and they had equipped their plants with large numbers of the machines. The capacity of the machines was enormous. The petitioner was building, or having constructed, larger and larger machines along more improved lines. These machines had been developed as a result of years of experience. All of the problems which came up in connection with the early machines had been met and the machines were giving great satisfaction. Although an Owens machine cost a large amount to manufacture, it was economical to operate. The semiautomatic machines were being rapidly displaced

and other methods of manufacturing narrow-necked bottles had been largely superseded on the basic date.

The income of the petitioner from royalties had mounted from $4,251.96 in 1905, to $993,360.88 in 1912. There was every prospect that the income from royalties in succeeding years would increase. Although the field of the glass-bottle industry had been pretty well covered by sublicenses given prior to March 1, 1913, the petitioner had reserved to itself the right to manufacture narrow-necked condiment bottles such as ketchup, grape juice, and kindred types of bottles and certain types of bottles for druggists and proprietary ware. This was a very large field in itself. This whole business was unquestionably referable to the license agreement held by the petitioner from the Toledo Glass Co. under its agreement of October 16, 1903.

In support of the value of approximately $13,000,000, which the petitioner claims for the patent rights owned by it at March 1, 1913, the petitioner relies upon three methods of valuation based (1) upon the value of its capital stock; (2) upon the opinion of expert witnesses; and (3) upon the amounts of royalties received from sublicensees.

## Valuation Based upon Value of Capital Stock.

Upon the basis of the market value of its capital stock the petitioner estimates the value of its patent rights at March 1, 1913, in the following manner: There were outstanding at March 1, 1913, 37,500 shares of common stock selling on the open market at $438 per share, and 5,000 shares of preferred stock selling at $118 per share, making a total stock value of approximately $17,000,000. There were net tangible assets of the value of approximately $4,000,-000. There were no trade-marks, trade-names or copyrights used in connection with the business. There was no good will of any appreciable value at that time on account of its own manufacturing activities. The total value of intangible assets, to wit, approximately $13,000,000, is ascribable to the patent rights and represents their fair market value.

The respondent objects both to the method of valuation and the manner of computation. Without conceding the correctness of the method he submits a computation based upon a value of $428 per share for the common stock and the value of $115 per share for the preferred stock, which results in an estimated " value in use " of the patent rights held by the petitioner on the basic date amounting to $5,062,233.42. The respondent's computation is in considerable detail and a statement of it would serve no useful purpose here. It may be noted that one of the chief differences between the peti-

11340°—28——79

tioner's and respondent's estimates is an item of upward of $4,000,000, which the latter ascribes to good will.

We are not willing to accede that the value of the capital stock of the petitioner as reflected by the price at which it was selling upon the open market at any given time is a criterion of the fair market value of the petitioner's assets. The position of the courts with respect to the valuation of the assets solely by the market value of the capital stock is clearly shown in *Pullman's Palace Car Co.* v. *Central Transportation Co.*, 171 U. S. 138, where the court said:

> The market value of its stock was not a proper measure of the value of the property, and such error resulted in largely increasing the supposed value of the property which the cross-defendant was under liability to account for * * *.
>
> * * * * The faith which a purchaser of stock in such a company has in the ability with which the company will be managed, and in the capacity of the company to make future earnings, may be well or ill founded. It is but matter of opinion which in itself is not property. While the value of the property is one of the material factors going to make up the market value of the stock, yet it is plainly not the sole one. Mere speculation has not uncommonly been known to exercise a potent influence on the market price of stock.

Also, in *Ray Consolidated Copper Co.* v. *United States*, 268 U. S. 373, the court said:

> The capital stock of a corporation, its net assets, and its shares of stock are entirely different things. * * * The value of one bears no fixed or necessary relation to the value of the other. The net fair value of the assets was clearly a relevant fact bearing upon the value of the capital stock. It does not appear that the Commissioner refused to consider the selling price of the shares or other factors. He may have given much consideration to the selling price of the shares, and have concluded that, under the conditions prevailing in the year 1920, the average price at which relevantly small lots were sold on the Stock Exchange was not a fair indication of the value of the capital stock. We can not say that he acted arbitrarily or abused his discretion in concluding that "the fair value of the capital stock considered as a whole is not materially less than the net fair value of the assets. * * * *"

At best the market value of the stock for investment or speculative purposes is no more than evidence of a corresponding asset value which we must consider in connection with all of the additional evidence available.

It is furthermore to be noted from a reference to the balance sheet of petitioner at September 30, 1912, that it had assets at that date which had nothing to do with the license agreement of October 16, 1903. It is also true that a part of the value of the capital stock at the basic date is attributable to the sublicense agreements made with many glass-bottle manufacturers. These sublicense agreements were not for any definite period of time. They continued as long as the manufacturers continued to use the Owens machines which the sublicensees had purchased from the petitioner. They had a value which

did not exhaust with the basic patents. The sublicensee under several of the sublicense agreements could have canceled its contract with the petitioner if it had chosen to do so but only by forfeiting to the petitioner the valuable machines which it had theretofore acquired from the petitioner and with which it had equipped its factory or factories. It is also to be noted that if the sublicensee forfeited its contract with the petitioner it would be subject to competition of the petitioner in the manufacture of the line of bottles, the exclusive right to manufacture which had been given to the sublicensee. It is for reasons such as these that many of the sublicensees continued to pay royalties to the petitioner after the expiration of the life of the valuable patents connected with the Owens machines. Henry G. Phillips, assistant to the president of the Owens Bottle Co., testified in part as follows:

Q. You state that at the present time you are receiving royalties under this license agreement?

A. Yes.

Q. On what patents are those royalties paid?

A. They are not paid on patents. They are paid on license agreements.

Q. On what license agreements are they paid?

A. On the original license agreements.

Q. Then you are getting royalties today, notwithstanding that these have been dedicated to the public?

A. Yes.

Q. On the patent which issued in 1904, which expired in 1921 and has been dedicated to the public, do I understand that the Owens Bottle Company is still receiving royalties under that agreement?

A. Under the agreement but not necessarily under that patent, under the agreement with the licensees. I may not have understood your question. The royalties are received under the license agreement with the licensees.

Q. You have already testified you are receiving royalties on this license agreement.

A. We are under the license agreement with the original licensees. We are still receiving royalties.

Q. For what purpose are those royalties paid you?

A. Well, I can recite some cases.

Q. I wish you would.

A. I have in mind one concern that is paying us royalties and has practically discontinued to use the machine. We asked them to give up the license. They said " Why do you want us to give up the license?" We said "Because we would like to go in the business ourselves." They said, "That is just the very reason we will continue to pay you royalty. We don't want you to go into business in that particular line."

Q. There are no other cases?

A. There may be others.

Q. Then the fact that the patents have been expired and have been dedicated to the public does not affect your rights to receive royalties under the license agreements?

A. In some instances it has; in some it has not. The royalties are dropping off all the time.

Q. You have received royalties from the year 1921 to 1926 under this license agreement?

A. Yes.

\*       \*       \*       \*       \*       \*       \*

Q. In 1924 you received royalties?

A. That is right.

Q. In 1925 you received royalties?

A. That is right.

Q. And in 1926, this year, you are receiving royalties under your license agreement?

A. Yes.

Q. To make the record clear, when you speak of license agreement, you mean the agreement of October 16, 1903?

A. Yes.

We are convinced from the foregoing that the market value of the shares of stock of the petitioner at or near March 1, 1913, throws little light upon the value of the license agreement of October 16, 1903, which was subject to an exhaustion deduction in income-tax returns filed subsequent to 1913.

### Valuation Based Upon Opinion Evidence.

The petitioner has offered the testimony of four witnesses who it submits are qualified and competent by their experience and knowledge of the facts to give an accurate opinion as to the March 1, 1913, value of its rights under the license agreement.

Henry G. Phillips, now assistant to the president of the petitioner corporation, has been identified with the bottle industry since 1903. His first connection with the glass industry was as a public accountant in the employ of the Audit Company of New York, during which employment he was, in 1904 and 1905, in close contact with the American Bottle Co. and its associated companies. In the year 1906, he became the auditor of the American Bottle Co. and later vice president and assistant general manager, which latter office he retained until January 1, 1919.

Based upon his studies of the royalties received by the petitioner prior to March 1, 1913, in connection with his own knowledge of the industry, he was of the opinion that the patent rights of the petitioner under the license agreement had a value at March 1, 1913, of not less than $10,806,926.06.

James Whittimore, who is now retired and living at Santa Barbara, Calif., was patent counsel for the Toledo Glass Co. from 1895, and for the petitioner from its organization in 1907, to 1919. He drew all the applications for patents on the Owens machine and procured the patents thereon. He has had wide experience in patent matters and has served as patent counsel of a majority of the automobile companies in the State of Michigan. He organized

the Automobile Association, an organization of automobile manufacturers which controlled the Selden patents. During his practice he has drawn many contracts relating to patents and patent rights, including both transfer and license agreements. Based upon his knowledge of the character and scope of the Owens patents, the quality of the bottles made by the Owens machine as compared with those made by the hand method, the royalties that the petitioner had received since 1905, and upon the fact that the taxpayer had the exclusive right to make bottles and jars in and throughout the United States under the Owens patents, it was his opinion that the value of these rights at March 1, 1913, was between twelve and fifteen million dollars.

William S. Walbridge, who is now chairman of the board of directors of the petitioner corporation, has been an officer of the Toledo Glass Co. since 1898, and an officer of the petitioner since its organization. He negotiated all the sublicenses granted by the petitioner. By taking into account the difference in cost between making bottles on the Owens machine and by hand or by the semiautomatic machines, the difference in the quality of the Owens machine-made bottles as compared with those made under other processes, the royalties which the petitioner was receiving, the use which the petitioner itself was making of the Owens machines in the unlicensed field, the exclusiveness of the patents, and the general recognition of the superiority which the Owens machines had attained, he considered that the value of the license agreement at March 1, 1913, was between twelve and fifteen million dollars.

Frank F. Ferguson, who is now secretary of the Illinois Glass Co. and also president of the Glass Container Association, a trade association embracing a large percentage of the bottle manufacturers of the United States, has been identified with the glass-bottle industry since 1898. He testified that for the four or five years preceding 1910, when his company obtained its first sublicenses from the petitioner, its business had remained practically stationary; that after it obtained its licenses in 1910 for liquor ware and its license in 1911 for proprietary and prescription ware, its business grew from that time forward; that by 1913 it was making more bottles by the Owens process than by hand and by 1916 its plants were completely equipped with Owens machines; that in 1913 he was familiar in a general way with the other sublicensees of the petitioner and the class of bottles which they were severally manufacturing. Having in mind the increase in the royalties which the petitioner was receiving during the period from 1908 to 1912, inclusive, and the advantages that the Owens machine had over the hand processes and semi-automatic machines and the rights which the petitioner still retained in the

unlicensed field to manufacture on its own account and that the Owens machine was the only automatic narrow-neck-bottle machine in existence, he was of the opinion that the value of the petitioner's rights under the license agreement at March 1, 1913, was between twelve and fourteen million dollars.

The respondent objects to the valuations made by these witnesses on the grounds that the witnesses were all interested parties; that their opinions of value were based upon retrospective estimates, no appraisal having been made by either of them on or about March 1, 1913, and that neither of the witnesses examined the state of the art as it existed on or about March 1, 1913.

We have carefully considered the testimony of each of these witnesses with regard for their qualifications as reputable business men and their knowledge of the facts, and conditions peculiar to the petitioner's business. Our observations have been set out at some length above. As we have often said, opinion evidence is by its very nature incompetent to establish mathematical certainties and is likewise immune to technical objections. The witnesses' personal qualifications and peculiar knowledge of the facts under consideration are the essential requirements. The manner in which witnesses will reach their several conclusions will necessarily differ as among financiers, lawyers and accountants according to their previous business experience and training. The respondent's objections are not fatal but merely go to the weight of the testimony and must be considered in our determination of the true value.

It may be well in passing to note more specifically some of the objections offered by the respondent to the computation used by Henry G. Phillips in arriving at his valuation. The computation, which we will not give in detail, is based upon future royalties for the period January 1, 1913, to July 1, 1922, totaling $16,285,000. This is the amount of royalties that it is said might reasonably have been anticipated at March 1, 1913, assuming that the royalties would increase each year over the remaining average life of the patents at the same rate that prevailed during the five-year period prior to March 1, 1913. The respondent objects to the assumption that the royalties would continue to increase at the previous rate and contends that it was reasonable to conclude from the evidence shown that royalties had reached the maximum in 1912.

The second objection is that the computation makes no allowance for the future expenses such as taxes, administrative expenses, possible litigation expenses, patent attorneys' expenses, etc. Four per cent of gross receipts, it is contended, would be a reasonable allowance for these expenses.

The third objection is that the witness uses a period of nine and one-half years for the running of the royalties whereas the controlling patents expired in eight years.

The fourth objection is that the rate of discount used of 8 per cent is too low; that in view of the hazards of the investment, the possibility of the development of a better machine, the possibility of labor strikes, litigation, of competition of users of Owens machines in Canada and foreign countries, and of general business depression, a reasonable rate of discount is 15 per cent.

The fifth and last objection is that in discounting the witness used the straight compound discount formula, whereas the Hoskold formula should have been used.

The respondent has submitted a computation fixing the March 1, 1913, value of the petitioner's rights to receive royalties at $4,035,-785.28. He has estimated that the royalties reasonably to be expected were $1,000,000 per annum, approximately the amount which the petitioner received in 1912; that the total royalties received over the remaining nine and one-half years would amount to $9,500,000; that there would be annual expenses for taxes, collection of royalties, administration, etc., of $40,000, or a total of $380,000; and that on account of the hazards of the business a prospective purchaser would demand on his investment a remunerative rate of interest of at least 15 per cent per annum. By discounting the future estimated net royalties for the remaining nine and one-half years to present worth by the Hoskold formula at rates of 15 per cent for remuneration and 4 per cent for redemption, he determined the present worth of the future expected net royalties of $9,140,000 to be $4,035,785.28.

We are convinced from all the evidence that the license agreement and the property rights therein which the petitioner owned at March 1, 1913, had a value much in excess of that admitted by the respondent.

We have shown in our findings of fact the scope of the patents involved and their influence upon the glass bottle and jar industry. The story is impressively told and we believe with a fair degree of accuracy in the following article which appeared in a pamphlet of the United States Department of Commerce, entitled "Bureau of Foreign and Domestic Commerce, Miscellaneous Series No. 60, The Glass Industry, Report on the Cost of Production of Glass in the United States, dated Washington, Government Printing Office, 1917":

About 1896 a machine was perfected which, though commercially successful, was somewhat crude and restricted to the making of wide mouth bottles and jars. This machine was not automatic.

Since about 1900 any number of bottle making machines that required one, two or three skilled operators have appeared on the market; these machines are usually designated as one, two or three-man machines. In 1900 a two-man machine for making wide mouth bottles was introduced. Shortly after the automatic machine was introduced there appeared on the market the "Johnny Bull" or United, an English three-man machine for narrow mouth bottles. In 1908 there appeared a three-man machine for narrow neck bottles, and in 1912 a one-man machine for wide mouth bottles, and in 1914 a one-man machine for narrow neck bottles.

Owens Automatic Machine. In 1902 the Owens automatic machine, invented by Michael J. Owens, of Toledo, was introduced commercially. The machine revolutionized the entire bottle making industry, and since its introducton has greatly increased the standard of efficiency in the bottle manufacturing plants of the United States and has made possible the gradual reduction in the price of bottles that has been noted during the years since its invention.

The first Owens machine that appeared on the market had six arms; the latest type of machine has 15 arms. Improvements have been made so that today practically any kind or shape of bottle from one-tenth of an ounce to 13 gallons in capacity can be made upon some one of the four types of Owens machines.

The operating speed of the 15-arm machine is indicated by the fact that more than 75,000 quart fruit jars are manufactured by a single machine in a 24-hour day. The machine is entirely automatic, gathering its own glass and blowing the bottle, and when an automatic conveyor is used, delivering it to the leer without the touch of a worker's hand. The machine can be run for 24 hours a day and every day in the year.

The machine is very costly, and the special equipment necessary to operate it makes the initial outlay exceedingly large. This fact, together with a serious doubt as to the machine's competitive ability, kept manufacturers from installing it generally. Prior to 1908 the Owens machine was restricted almost exclusively to licensing on a basis of royalty. In that year, however, the Owens people began the manufacturing of bottles. In a report by President Libbey, of The Owens Bottle-Machine Company, he states that, exclusive of the plants controlled by The Owens Bottle-Machine Company, there are 15 factories operating 114 machines and having a normal annual production of over 850,000,000 bottles. There are installed in the United States at present 5 fifteen-arm, 97 ten-arm, 87 six-arm, and 1 special machine, making a total of 191 machines. There are 13 machines in Canada.

The Owens European patents were sold in 1907, to a European combination, controlled by German shareholders, for 12,000,000 marks. The first three Owens machines were sold in Europe in 1908, and there are now 60 or 70 machines in use. It is significant that Japanese capitalists, despite the cheap hand labor to be had in that country, have purchased the Owens Japanese patents and are now installing the most modern Owens machines.

In arriving at the value which we have ascribed to the license agreement at March 1, 1913, we have carefully considered all of the facts bearing upon the market value at that date. The development of the glass bottle and jar industry over the few years immediately preceding the basic date had been rapid. The introduction of the automatic machines had more than doubled the production and had reduced cost of manufacture more than one-half. The petitioner was

in the foreground of the development and was identified with a large group of the leading manufacturers in the United States. The petitioner's royalties from sublicensees had increased from $387,402.17 in the year 1908 to approximately $1,000,000 in the year 1912. There is no evidence to indicate that the monopoly which the petitioner held at March 1, 1913, under the license agreement of October 16, 1903, would not continue for the full life of the patents involved. At the beginning of the year 1913 the petitioner was making preparations for entering the manufacturing field on its own account on a large scale with fair assurance of considerable income from that source.

We also think that the exhaustible value of the license agreement is best arrived at from an estimate of the royalties receivable during the period of 9½ years from March 1, 1913, and by reducing such receipts from royalties to a present-worth basis. We think that the petitioner could, on March 1, 1913, have clearly foreseen the receipt from the royalties for the 9½-year period of $1,300,000 per year. We then think that the future expected earnings should be reduced to present worth, which we determine to be $7,000,000. An aliquot part of this amount is the exhaustion deductible from gross income for the taxable period under review.

The petitioner is also entitled to a deduction for the taxable period involved of an aliquot part of the cost of the Brooke Patent No. 723983, acquired December 14, 1915, for $162,500, and the Rawling & Miller Patent No. 805027, acquired September 12, 1916, for $5,015.

*Judgment will be entered on 15 days' notice, under Rule 50.*

Considered by LITTLETON, TRUSSELL, and LOVE.