*880 OPINION.
Artjndell:
In view of the respondent’s admission of the errors charged in the second and third issues, the petitioner’s tax liability and the deficiency, if any, for 1920, should be redetermined upon the basis of the calendar year 1920, and the net income determined by the respondent for 1923, should be reduced by $15,423.47 on account of Hew York State franchise taxes.
The lone issue remaining for decision by the Board is the March 1, 1913, value of 22 patents, as the basis for the computation of the annual deductions for exhaustion. There is no dispute as to the *881 average remaining life of these patents from the basic date; the respondent determined that to be 11.0095 years, and that is not contested by the petitioner. The respondent determined the fair market value of the patents, as of the basic date, to be $436,396.87. The petitioner contends that their fair market value was not less than $4,100,000.
The 22 patents owned by this petitioner on March 1, 1913, have been divided for convenience into two groups. The 11 patents comprising the “ Milk Powder Group ” are regarded by the petitioner as of the greater importance and value to its business. It is with this group of patents that the great mass of evidence is chiefly concerned. The 11 patents comprising the “ Miscellaneous Group ” have been given but scant consideration by the petitioner in the presentation of its case.
Besides the great amount of testimony, the evidence includes more than 100 exhibits of historical matter, graphs, ledger accounts, statistical data, and tax returns. On the whole, the evidence relating to the patents comprising the “ Milk Powder Group ” covers in a broad and comprehensive fashion tlie state of the art of reducing milk to a dried form and the improvements effected by the inventions covered by petitioner’s patents; the security and comprehensiveness of the patent protection; the economic advantages resulting from the patented inventions; the superiority of the product obtained by the use of the patents; the growth of the patent-protected business to the basic date; and the future prospects which on the basic date might have been reasonably anticipated. All of these are covered in much detail in the findings of fact, and we shall not burden the opinion by their repetition. There is also in the record the testimony of pei'sons having intimate knowledge of the patented inventions and in intimate contact with the pátent-protected business; evidence as to negotiations carried on by the petitioner with a prospective purchaser of the petitioner’s milk powder business; and expert testimony as to the value of the patents at the basic date. To attempt an analytical discussion of all of this evidence and to balance the weight to be given to the testimony of the several witnesses would carry this opinion far beyond the bounds of reasonable limitations and add but little to the certainty of its conclusion.
It has long been recognized that questions of value and estimates thereof involve matters of opinion upon which minds are prone to differ. An opinion as to value is generally based upon a prior determination of extrinsic facts. Disagreement as to these facts often results in differences of opinion as to value. Common experience indicates that agreement upon these extrinsic facts offers no assurance of agreement upon the ultimate question of value. The difficulties inherent in the problem are increased when an attempt *882 is made to determine values as of a distant date, either past or future. The case at bar clearly demonstrates the truth of these things. Confronted with the same identical facts as to conditions existing at March 1, 1913, — the state of the art, the improvements effected b}r the inventions, the security and comprehensiveness of the patent protection, the economic advantages resulting from the patented inventions, the superiority of the product obtained by use of the patents, and the growth of the patent-protected business to the basic date — -the opinions of the two groups of witnesses, as to the fair value of the patents at the basic date, are so substantially different as to seem wholly irreconcilable. An appreciation of the difficulty of reconciling the differing values of the witnesses may be indicated by stating that Donahoe and Dyer, who testified for the respondent, fixed the value of the patents as of March 1, 1913, at $260,000 and $200,000, respectively, while the four witnesses called by the petitioner valued the patents as of the same date at $3,500,000 to $4,000,000. Three of the witnesses called by the petitioner had spent their entire business lives in the development of the petitioner’s patents and the business accruing from operations under protection of those patents; the fourth is an engineer and practicing patent attorney with a wide and varied experience in the valuation of patents. The witness Dyer, called by the respondent, is a patent expert of extensive experience in the valuation, purchase and sale of patents; while Donahoe, also called by the respondent, is an engineer with a large experience in the valuation of real and personal property. All of these witnesses are intelligent men of affairs, possessing such qualifications as to entitle their opinions to great weight and respect. -We believe that they are honest in their convictions, and that each endeavored to give the Board a frank and sincere analysis of conditions existing at the basic date, as they observed them, and of the premises upon which they based their conclusions.
Nor has the problem been made easier by the inconsistent statements of the petitioner, made under oath in its tax returns. The highest patent value returned by the petitioner for the purpose of the capital stock tax was $116,169.15 in the return for 1921. In the capital stock tax return for 1917, filed four years after the basic date, the patent value returned was but $55,000. In the capital-stock-tax returns for 1923 and 1925, the patent values returned were $107,192.44 and $69,286.54, respectively; while in its income tax returns for the same years the petitioner claimed a March 1, 1913, patent value, as the basis for the deduction claimed for exhaustion of patents, of $1,269,408.80 in excess of cost. If the book value of patents, as disclosed by the balance sheets for 1923 and 1925, correctly reflects the cost of the patents, the highest March 1, 1913, patent value was claimed in the return for 1925, and amounts to $1,328,107.56. As *883 late as 1928, a year and a half before this proceeding was heard, the petitioner claimed a March 1, 1918, patent value of $1,319,538.33 in its income-tax return for 1927. The petitioner must find it difficult to explain this discrepancy between the March 1, 1913, value of its patents, as disclosed by the income tax returns, on the one hand, and the capital stock tax returns on the other. There is no explanation in the record and it is doubtful that a satisfactory one may be found, in the light of the testimony of one of the petitioner’s chief witnesses to the effect that one-half of the consideration received by the petitioner in 1928, upon- the sale of its business and assets to the Borden Co. was for intangibles, and that the whole consideration was 54,000 shares of the capital stock of the Borden Co., which shares, at the date of the transfer, had a fair market value of $159 per share. All of these returns, both capital stock tax and income tax, were executed under oath by two officers who, as witnesses in this proceeding, testified that the March 1, 1913, value of the petitioner’s patents was at least $3,500,000 and $3,600,000, respectively. To say the least, these facts cast some shadow of doubt upon the judgment of these two witnesses as to the value of the patents at the basic date.
On March 1, 1913, we find the petitioner reducing milk and other liquids and semiliquids to the form of a dry powder containing all of the constituent solids of the original milk or other liquids in their natural state, and from which the original milk or other liquid could be reconstituted at will, with all of its original characteristics, by simply mixing the powder with water in proper proportions. At the basic date the pioneering work in this new field, which was actually commenced by Stauf in 1900 in an endeavor to preserve the blood of slaughtered animals for feeding to tuberculars, had been completed, and the uncertainties enveloping the experimental and development work had been left more than four years behind. The addition to the Stauf process in 1907, of the preliminary step of preconcentration, of liquids by vacuum in the Merrell-Merrell-Gere process, had converted a basic and practicable, but expensive and unprofitable, method into a commercially profitable and successful process. The addition in 1907, through acquisition of the patent rights, of the Bevenot-debTeveu process of injecting the spray into the heated chamber under hydraulic pressure brought further improvements in the product and substantial economies in manufacture; and additional improvements in the product resulted by the addition of the Glas process of homogenization, in 1912. A substantial market for the patented products had already been developed. From a small beginning of 390,000 pounds production in 1906, by 1912 the production and sales had risen more than 1,300 per cent. The production and sales for 1908 showed an increase of 16.22 per cent over 1907; for 1909, 41.83 per cent over 1908; for 1910, 10.42 *884 per cent over 1909; for 1911, 46.68 per cent over 1910; and for 1912, 62.89 per cent over 1911. The average annual increase in production and sales of patented products for 1908 to 1912, inclusive, was 37.61 per cent. Three plants were being operated in New York State in the production of the patented products, but these were unable to cope with the increasing demand for these products and the petitioner found it necessary to make importations from England and Australia. The patented products were being used extensively in the baking, confectionery and ice cream industries; they were being furnished to hospitals and State institutions, in various for-mulae and combinations, in large quantities; they were used by the United States Naval Fleet in its cruise around the world as substitutes for fresh milk; and had been sent into and used in localities when shortages existed in the regular supply of fresh milk. The average book profit per pound of food products produced, for the period 1908 to 1912, exclusive of profits from sales of by-products, was 2 cents. This the respondent concedes was low, due to excessive charges for depreciation of plant facilities. If the profits were corrected to exclude depreciation charges in excess of 10 per cent of plant investment, a rate which respondent admits 'to be fair, the average profit amounts to 3 cents per pound. These profits were produced on an average plant investment of 6 cents per ppund and an average investment in net working or current assets of 3 cents per pound. While the production for 1912 exceeded that for 1911 by 62.89 per cent and the sales for 1912 were a quarter of a million dollars more than for 1911, there was a recession in net profits for 1912, a fact for which there is no explanation in the record. The average book profit on the production of powdered food products for 1912 was 1.5 cents per pound as compared with 3 cents per pound for 1911; and if the profits are corrected to exclude excessive depreciation charges, the average profit for 1912 is 2 cents as compared with 4 cents for 1911. This recession in profits for 1912, which are not only below the average profit for 1911 but are also below the average for the five-year period, is a matter which no doubt would have been weighed very seriously by a prospective purchaser of the patents and must be reckoned as an important factor in an attempt to determine the value of the patents at the basic date. Johnson v. United States, 44 Fed. (2d) 244.
However, looking backward from March 1, 1913, it may be fairly said that the history of the business presents a picture of consistent and expanding development, with the dropping off of the profits in 1912 as the only high light to indicate that there was anything sporadic in its nature. With this history back of it, the business might reasonably be expected to grow; its future must be judged *885 in the light of what has transpired in the past. Here is the point where the two groups of witnesses, so • to speak, part company. Their opinions as to the future growth of the patent-protected business differ materially and this is their substantial difference which leads to widely separated values of the patents at the basic date.
Dyer’s testimony was devoted almost entirely to an attack upon the validity of the most important patents and it is clear that his opinion of invalidity was the predominating influence in his valuation of the patents. On the other hand, the witness, Frank Soule, standing on the threshold at March 1, 1913, would prophesy that the time was coming “ when powdered milk, whole milk, sold in cans, the same as condensed milk is now sold, we will say, but in a larger package, would be the sanitary milk supply of the large cities, like New York, Washington, and other places.” All litigation since March 1, 1913, as far as it has gone, has sustained the validity of the petitioner’s patents at March 1, 1913, and so Dyer’s opinion that they were invalid must fall. It is true that some time after 1913 there was a decision by a United States District Court which was adverse to the petitioner, and though this was reversed on appeal, Dyer points to it as corroborating his view that a question of doubtful validity existed at March 1, 1913. But long before 1913 this petitioner had been advised by one whom the respondent admits to be a highly qualified patent attorney that these patents were valid. We have no reason to believe that the question of doubtful validity would have been present in the mind of a prospective purchaser of these patents to any greater degree than might be reasonably anticipated in any ordinary case of purchase and sale of patents. Soule’s forecast was unquestionably overly optimistic.
Hansen, an expert witness called by the petitioner, estimated, upon the basis of experience prior to the basic date, there would be an annual increase in sales, to and including 1923, equivalent to 35 per cent of the sales of the next preceding year. The production for 1912 is the starting point for his computation. The witness Merrell, also called by the petitioner, is but little more conservative. The average increase in business for the period 1908 to 1912 was 37.61 per cent. Two of the five years in that period show an increase over the preceding year’s business of more than 40 per cent and the year 1912 shows an increase of nearly 63 per cent over 1911. But that five-year period was one of rapid development and expansion, such as might be expected of any new business producing a product as satisfactory and meritorious as the petitioner’s. Such rapid development and expansion can not reasonably be expected to continue indefinitely; sooner or later, any healthy business reaches and passes *886 the point of rapid growth incident to its infancy and settles down to a much less substantial but normal growth. Herein lies the fallacy in the estimates of Hansen and Merrell, for they have assumed a future growth, throughout the average life of the patents, approximately equal to the years in which the most rapid expansion would naturally be expected. All things considered, we believe that Oscar Soule and Donahoe, witnesses for the petitioner and the respondent, respectively, just about struck a fair average when they fixed the future growth of the business from March 1, 1913, at an annual increase of 20 per cent. That conclusion of Oscar Soule is based upon almost a lifetime of observation, as a partner in the predecessor partnership and an executive officer of the petitioner, of the development and growth oí the business. Certainly, he is in a far better position to pass judgment on the matter than Hansen, who, for all the record shows, never heard of this petitioner or its business until called as a witness in this proceeding.
The testimony of Oscar Soule presents two methods of valuation. The first of these is based upon an annual increase in production equivalent to 20 per cent of the next preceding year’s production, the production for 1912 being used as a starting point, and results in an estimated production to the end of 1923 of 189,614,000 pounds. He estimates the future profits on this production at 2 cents per pound, or a total profit for the eleven years of average patent life of $3,792,280. This estimated profit, he says, justifies a patent valuation, as of the basic date, of $3,500,000. The second method assumes the same rate of growth in production and profits, and results in an estimated profit for 1923, the last whole year of patent life, of $720,000. This estimated profit, Soule points out, represents a return of 10 per cent upon a capital investment of $7,200,-000, which, according to “ a rule of thumb,” should be allocated one-half to tangibles and one-half to intangibles. The trouble with the first method is that it assumes that a prospective purchaser of the patents will pay a price therefor equal to the entire income which he could expect, under the most favorable circumstances, to receive during the remaining life of the patents. It may not be assumed that a prudent business man will invest his funds in a hazardous proposition, such as patents, without any expectation of a fair retui'n on his investment; and the greater the risks and hazards, the more will he discount the future and pay a price that seemingly assures him against loss while yielding him a fair return. The-second method assumes that during the period of patent monopoly, an intangible structure, a sort of going business value or good will, of $3,600,000, will be built up; and that at the end of the patent monopoly, the profits will continue to be substantially the same as for 1923, in perpetuity. Granting the assumptions, which *887 we do not, the whole of the accretion in going business value can not be attributed to the patents or the patent monopoly. On the contrary, much of it will accrue in sheer spite of the patents and may be fairly attributed to capable management and organization to conduct the promotion, exploitation, development and operation of the business, and to the good will of patrons. Of course, the patent monopoly provides the opportunity for building up a value of this sort, and gives the business a great advantage over its competitors when the monopoly terminates; but the returns which it will yield, and that is the lone basis for the claim of value, will be entirely dependent upon a continuance of capable Management and organization and the same business policies conducive to the retention of the good will of its patrons. Returns of this sort can not be attributed to the patents.
The basis for Donahoe’s valuation of $260,000 was substantially as follows: He took the production for 1912, which was the highest for any year prior to 1913, determined how much of that was skim milk powder and how much was whole milk powder. He estimated that the maximum royalties which the petitioner might expect to receive under license agreements, though there were no such agreements prior to, or until two years after, March 1, 1913, were 1 cent per pound for skimmed milk and 2 cents per pound for whole milk. Assuming that the estimated royalties represented the maximum profits attributable to the patents, he determined that the 1912 profits directly attributable to patents amounted to $65,000. He assumed an annual growth in the business equivalent to 20 per cent of the next preceding year’s production. He found upon investigation that the American Brass Co. and the General Electric Co; were enjoying approximately the same rate of growth, about 1913, and that the earnings of those companies represented an average return of 10 per cent on the 1913 market prices of their stocks. He then determined that if 7.4 per cent of the purchase price was set aside each year to accumulate with interest, at the end of the average life of the patents a prospective purchaser would have returned to him his investment. He therefore assumed that the proper rate of capitalization of the future earnings should be 17.4 per cent which, he says, is equivalent to a purchase of 5.74 years earnings; but he reduces the factor to 4, to reflect “ the effect the buyer and seller would give to the uncertainties.” Multiplying $65,000, the maximum profits which he attributed to patents for 1912, by 4, he concluded that the value of the patents, at the basic date, was $260,000. His valuation is not nearly as complex as his statement of it makes it appear. Strip it of all of its dressing, and you find that after all it amounts to the capitalization, at the rate of 25 per cent of assumed earnings of $65,000 per year, for 10 years, or total earnings of *888 $650,000. Suffice it to point out, that had Donahoe followed through his own assumed rate of growth of the business and his own assumed profits of 1 cent per pound on skimmed milk and 2 cents per pound on whole milk, he would have arrived at estimated gross earnings from March 1, 1913, to the end of 1923, of approximately $2,750,000, instead of $650,000. We are satisfied that the figure of $2,750,000 more nearly represents the gross earnings which this petitioner might reasonably have anticipated, at March 1, 1913, over the remaining average life of its patents. While we are perfectly willing to believe that a prospective purchaser of these patents, at March 1, 1913, would gladly have taken advantage of any opportunity to purchase them at a price of $260,000, with the prospects that they would yield gross earnings of between $2,500,000 and $3,000,000 over the next 10' years, we are as equally reluctant to believe that the petitioner would have willingly made the sacrifice.
Next, we have for consideration, for whatever light it may throw on the problem, the correspondence between Frank O. Soule, in behalf of the petitioner, and F. S. Taylor, in behalf of the Borden Condensed Milk Co., which took place in July, 1913, and in which negotiations were carried on with a view to the purchase of petitioner’s business, by the Borden Co. The most that can be gathered from this correspondence is that the Borden Co. offered to purchase the petitioner’s business, lock, stock and barrel, for $1,500,000 plus one-half of the profits of the business above $150,000 for a period of five years; and a suggestion on the part of Taylor that the board of directors of the Borden Co. might be willing to modify the offer “ to the extent- of requiring us to pay an additional amount for your working and trading assets over and above the $1,500,000, and to the further extent of extending the period in which you would participate in the profits ” from five to ten years. Whether the Borden Co. actually went so far as to modify its first offer to the extent indicated in Taylor’s last letter does not appear. Apparently the negotiations ended with Taylor’s last letter, for there is nothing-further of record until the sale of the business to the Borden Co. 15 years later. There is nothing in the correspondence from which we can deduce that the patents were of the high value claimed by the petitioner.
In an attempt to support the value of $3,500,000 which he placed upon the petitioner’s patents, as of March 1,1913, one of the witnesses testified that the entire business was sold to Borden Co. in 1928 for 54,000 shares of capital stock, which had a value, at the date of transfer of $159 per share. Aside from the unsupported statement of the witness as to the fair value of the Borden Co. stock, at the date of the transfer, we wish to point out that this transaction took place *889 15 years after the basic date, and at a time when every one of the 22 patents had expired. This transaction can hardly be accepted as throwing any light upon the problem.
Our conclusion, which has been reached only after a careful study and weighing of all of the evidence, is that the March 1, 1913, value of the 22 patents owned by the petitioner on that date was $1,750,000.
This brings us to the consideration of a matter very earnestly pressed upon us by the respondent in the brief. There he contends that the allowance for exhaustion must be computed separately for each patentj and that since the petitioner has not proven the separate value of each patent, so as to permit the computation in such fashion, the petitioner’s case must fail. We can not subscribe to that view. In the deficiency notice, the respondent determined the value of the patents as a group and computed the allowances for exhaustion accordingly. The petitioner accepted that situation. All of the witnesses for the petitioner and the respondent testified to the value of the patents as a group. Aside from these facts, the evidence is clear and unmistakable that it would not only be impossible, but highly improper, to place a separate value on each of the patents comprising the “Powered Milk Group.” The important patents in the powdered milk group are the Stauf patent, the Merrell-Merrell-Gere patent, the Bevenot-deNeveu patent, the Glas patent, and the Merrell-Merrell-Gere apparatus patent. The other six patents might be called “ hedging ” patents, since they were obtained almost solely for the purpose of closing any loopholes which might have been left in the claims of the more important patents. It is doubtful that any one of the five important patents, standing alone, had more than a nominal value. The Stauf patent, which is the basic one, covered a process which proved to be very expensive and commercially unprofitable. Only the addition to the Stauf process of the preliminary step of preconcentration of liquids by vacuum in the Merrell-Merrell-Gere process, made the Stauf process commercially profitable and successful. The addition of the Bevenot-deNeveu and the Glas processes brought further economies in manufacture and improvements in the product. The witness Brown, called by the petitioner and admitted by the respondent to be a highly qualified patent attorney, testified that the Merrell-Merrell-Gere process patent could not be operated by other than the owner of the Stauf process patent without infringing the latter, and ownership of both patents gave the petitioner a monopoly on the process of spray-drying milk, precondensed by the vacuum process; that the Bevenot-deNeveu process patent invoked a process which could not have been carried to fruition without infringing the Stauf process patent; that the Glas process patent was being infringed, when acquired by the petitioner, by the product at that time pro *890 duced from whole milk by the combined Stauf, Merrell-Merrell-Gere, and Bevenot-deNeveu processes; and that the Merrell-Merrell-Gere apparatus patent could not be operated without ownership or infringement of the Merrell-Merr'ell-Gere process patent. This witness was thoroughly acquainted with petitioner’s patents, since he had solicited the Stauf process patent, had prosecuted the United States application for patent on the Bevenot-deNeveu process; and had been associated with the petitioner in all litigation, since 1907 in which the petitioner enjoined and eventually collected damages from infringers of its patents.
All of the patents in the “ Powdered Milk Group ” were interdependent. In the hands of separate owners, they would be of little value. Collectively, under a single ownership, they represent a valuable property right, and it is this right which is being gradually exhausted. Under less compelling circumstances, the Board has not found any obstacle to determining the allowances for exhaustion of patents upon the basis of a group value and the average life of the group. See Union Metal Mfg. Co., 4 B. T. A. 287; Owens Bottle Co., 8 B. T. A. 1197; and Western Wheeled Scraper Co., 14 B. T. A. 496.
The petitioner is entitled to annual deductions for exhaustion of its patents based upon a March 1, 1913, value of $1,750,000 and an average life of 11.0095 years.

Judgment will he entered under Rule 50.