Mitchell Camera Corporation v. Commissioner.
Mitchell Camera Corp. v. Commissioner
Docket No. 8058.
United States Tax Court
1947 Tax Ct. Memo LEXIS 175; 6 T.C.M. (CCH) 719; T.C.M. (RIA) 47172; June 24, 1947
*175 On the record, held: .n1. Petitioner has failed to establish error in the basis used by respondent in determining depreciation on its patents. 2. The amounts deductible as ordinary and necessary business expenses determined. Harry Friedman, Esq., 538 Munsey Bldg., Washington, D.C., for the petitioner. E. M. Woolf, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: Respondent determined deficiencies in income and declared value excess-profits taxes of petitioner for the year 1941 in the amounts of $71,301.66 and $2,177.28, respectively. The determination of the correct net taxable income of petitioner for this year requires the ascertainment of the correct net income of petitioner for the calendar years 1939 and 1940 because of carry-over net losses claimed by it for those *176 years. The parties agree that upon the determination of that income for 1939 and 1940 the amounts of the carry-over from each year will be determined under Rule 50. The issues are whether respondent erred (a) in fixing the basis of patents acquired at date of organization of petitioner as $1,180,157.59 for purposes of computing depreciation, (b) in determining the accumulated reserve for depreciation on such patents to be $1,035,539.75 as of December 31, 1938, (c) in computing depreciation on such patents during the taxable years 1939, 1940, and 1941, based on a composite average life of 12.3666 years from July 27, 1929, date of acquisition by petitioner, (d) in disallowing New York office expenses in the amounts of $11,161.88 and $1,574.17 for the years 1939 and 1940, respectively, and (e) in disallowing "Special Expenses" in the amounts of $1,637.49, $1,583.71, and $3,836.61 for the taxable years 1939, 1940, and 1941, respectively. Two issues, (1) the disallowance by respondent of alleged worthless debts of $27,800 and $4,676.78 in the years 1940 and 1941, respectively, and (2) the inclusion in income for the years 1939, 1940, and 1941 of interest in the respective amounts of *177 $12,417.24, $12,355.54, and $15,479.56, were conceded by petitioner at the hearing. These adjustments will be reflected in the recomputation under Rule 50. Certain of the pertinent facts were stipulated by the parties and are so found. Such facts in our findings of fact as are not included among those stipulated we find upon the testimony and exhibits. Findings of Fact The petitioner is a Delaware corporation organized on July 12, 1929, with principal office at Los Angeles, California. The return for the year here involved was filed with the collector for the sixth district of California. Mitchell Camera Company of California (hereinafter referred to as "Mitchell of California") for a number of years prior to 1929 was engaged in the business of manufacturing professional motion-picture cameras and accessories for the large motion-picture studios in California. All of its business was in patented products manufactured under patents owned by it. In 1927 the introduction of "sound" motion pictures revolutionized the motion-picture industry and Mitchell of California became the sole supplier of cameras for the major motion-picture studios. This was due to the fact that under its *178 patents were produced cameras relatively noiseless in comparison with those of its competitors. Because of the patented features of the Mitchell camera, it was practically impossible to use any other camera in the production of "sound" motion pictures, and the demand for Mitchell cameras increased greatly, resulting in a large backlog of incompleted orders in 1929. In that year the stock of Mitchell of California was owned two-thirds by Henry F. Boeger, who was its president, and one-third by George A. Mitchell, who was its secretary. Prior to May 1929, Harley L. Clarke, not then financially interested in Mitchell of California, became interested in acquiring its business and assets. In 1929 William Fox was president of the Fox Film Corporation and of Fox Theatres Corporation, and was otherwise generally engaged in the motionpicture business. Fox had been president of both corporations since their organization, the film corporation having organized in 1915 and the theatres corporation in 1925. William Fox is now general manager of petitioner. His family now controls the stock of petitioner through ownership of stock in All Continent Corporation, a holding company. The petitioner's *179 capital upon organization consisted of 30,000 shares of common stock, no-par value. Grandeur, Incorporated (hereinafter referred to as "Grandeur"), purchased the entire capital stock of petitioner "as of July 1, 1929, for the stated sum of $3,100,000 under circumstances hereinafter described. The salient facts leading to the organization of the petitioner and its acquisition of the patents involved are set out chronologically as follows: On May 24, 1929, Harley L. Clarke addressed a letter to William Fox, which letter is signed "Accepted, William Fox". This letter confirms an agreement between Clarke and Fox. Clarke agrees to cause to be organized a corporation to be known as Grandeur, Incorporated, the chief object of which shall be the purchase, sale, lease, and/or license of motion-picture projectors, cameras, and/or equipment or devices to be used in connection with motion-picture projectors. Clarke agreed "to cause a subscription to be made for one-half of such capital stock" and Fox agreed to subscribe for the other one-half at a cost to each of $250,000 in cash. On this same day, a second letter was addressed to William Fox by H. L. Clarke, and was signed by Fox as approving *180 and acknowledging his understanding. It reads as follows: "With reference to agreement entered into between us, today, concerning the wide film situation, this will confirm our understanding that after Grandeur, Inc., has been duly organized and its business affairs in operation, out of the first profits earned and before any dividends shall have been paid, you shall be reimbursed in the sum of One Million ($1,000,000) Dollars, and I shall be reimbursed in the sum of Five Hundred Thousand ($500,000) Dollars for expenditures, labor, overhead, and services for research work in the development of the wide film art. "Grandeur, Inc., shall cause to be created and delivered to each of us a note or other form of acknowledgment or indebtedness suitable to our respective counsel, evidencing the foregoing arrangements." On the next day, May 25, 1929, H. L. Clarke addressed a letter to William Fox, which is signed by Fox "Approved and agreed as to our understanding." This letter reads in part: "I am now negotiating for the purchase of the Mitchell Camera Co. This purchase shall be for the benefit of a corporation to be organized by us, one-half of the stock of which is to be owned by *181 each of us. This corporation shall be either independently operated by us or shall be a wholly owned subsidiary of Grandeur, Inc., as shall be mutually agreed upon between our respective counsel." On June 6, 1929, a contract was executed by and between H. F. Boeger and George A. Mitchell, called the "sellers", and H. L. Clarke, called the "buyer". The terms of this agreement provide in part as follows: * * *
"1. The sellers agreed to sell or caused to be sold and the buyer agrees to purchase or cause to be purchased, as hereinafter provided, all of the property, business and assets of every kind and nature of the Mitchell Camera Co., a California corporation, hereinafter sometimes referred to as the corporation, including in such property, business and assets, furniture, fixtures, jigs, dies, tools, patterns, machinery, merchandise on hand, claims, insurance, securities, choses in action, contracts, agreements, leases, leasehold interests, licenses, trade-marks, trade names, trade rights, brands, patents, applications for patents, patent rights, also all cash and accounts receivable received by or becoming due to the corporation after June 30, 1929, and the good will of the *182 business of the corporation or a similar name by or in connection with a corporation to be organized by the buyer to carry on a business similar to that carried on by the corporation. The sellers also agree to cause to be conveyed to the buyer free and clear of all liens, claims and encumbrances the real estate and improvements being constructed thereon, situated in West Hollywood, county of Los Angeles, State of California, more particularly hereinafter described, being the proposed new manufacturing plant, offices and administration building of the corporation, said improvements to be fully completed in accordance with the existing plans and specifications relating thereto, with equipment and machinery to be installed therein. * * *
"2. The sellers hereby represent and warrant that the corporation now owns or will acquire all letters patent under which it manufactures its products, said patents to be included in the assets to be sold to the buyer. "3. The purchase price of said property, business, and assets shall be the sum of $1,475,000, payable as herein provided. "4. The buyer shall forthwith deposit with Continental Illinois Bank & Trust Co., Chicago, Ill., the sum *183 of $100,000, which said sum shall be held in escrow by said bank and applied on the purchase price as herein provided. "(a) The buyer shall forthwith proceed to cause to be organized a corporation to acquire the assets, business, and property of the corporation (hereinabove described) for convenience hereinafter called the 'New Corporation.' The details of the organization of the corporation and the charter provisions shall be subject to the approval of counsel of the sellers and the buyer, said organization to be completed on or before July 1, 1929. The corporation shall have an authorized issue of preferred stock in the amount of $1,000,000, consisting of 10,000 shares of the par value of $100 per share, said preferred stock to be cumulative as to dividends in the amount of 7 percent per annum. Said preferred stock shall be fully paid and nonassessable. The charter of the new corporation shall contain certain restrictions on corporate action as set forth in Schedule A, annexed hereto and made a part hereof. "(b) On or before September 1, 1929, the buyer shall cause to be deposited with said Continental Illinois Bank & Trust Co. an additional sum of $375,000, and 10,000 shares *184 of the preferred stock of the new corporation, together with an agreement by the new corporation and H. L. Clarke jointly and severally to purchase from the seller said 10,000 shares of preferred stock of said new corporation at the par value thereof, $100 per share, plus accrued dividends thereon at the rate of 7 percent per annum, to be taken up and paid for as follows: * * * * * *
"6. It is further agreed that the sellers shall, contemporaneously with the consummation of the purchase hereunder, cause to be executed a contract or contracts with the new corporation by which the sellers shall obligate themselves for a period of 5 years after the consummation of such purchase not to engage or to become interested, directly or indirectly, as an individual, partner, or stockholder, director or officer or employee in or to any motion-picture camera business, other than with the buyer or the new corporation. "7. The sellers and each of them further agree that at the request of the buyer they shall become employed by the new corporation in the same capacities as they now serve with the corporation for a period of at least 1 year and at a salary for each of them of $25,000 per annum, *185 payable monthly, beginning July 1, 1929." * * *
On June 13, 1929, Grandeur was incorporated under the laws of New York State. Capital was represented by 100,000 shares common stock, no-par value. One-half of its stock was acquired by William Fox and one-half by H. L. Clarke interests, for a stated consideration of $4,000,000, under circumstances hereinafter described. On June 24, 1929, a contract was executed between Grandeur, as licensor (referred to therein as Grandeur), and Fox Theatres Corporation, as licensee (referred to therein as Fox). The relevant terms are as follows: "1. (a) Grandeur hereby grants to Fox a non-exclusive, non-assignable license to use in the theatres owned, controlled and/or operated by Fox, Fox Films Corporation and their respective subsidiary and/or affiliated companies (subject to all the terms, conditions, limitations and agreements herein contained) special motion picture projectors, without lamp or lamphouse, adapted for use in connection with so-called "Grandeur" films (films wider than the regular 35 M.M.) in the quantities and at the times hereafter in this agreement provided and to employ and make use of (to the extent necessarily involved *186 in such use of said projectors) any and all United States patents and applications for United States patents, relating to said projectors or to such use thereof, which are now owned or controlled, or which may during the term of this agreement be owned or controlled by International Projector Corporation, or in respect of which International Projector Corporation has or may hereafter during the term of this agreement have the right to grant such licenses, Grandeur being the licensee of International Projector Corporation, with the right to assign such use of such patents. "(b) Grandeur agrees to install in such theatres of Fox, Fox Film Corporation and/or their subsidiary or affiliated Companies that Fox may from time to time designate, twelve (12) such special motion picture projectors, for which Fox shall pay Grandeur on installation thereof the sum of Six Thousand Dollars ($6,000). "Grandeur agrees to supply to Fox, and Fox agrees to accept or cause to be accepted from Grandeur under the terms provided in this Agreement, during the period commencing approximately February 1, 1930, but in any event as soon as projectors shall be ready for delivery, and ending ten (10) years thereafter, *187 all motion picture projectors using films wider than the regular 35 M.M. that may be required or desired by Fox, Fox Films Corporation and/or their subsidiary or affiliated Companies during such period, it being the agreement of the parties hereto that Fox shall, during such period, use exclusively such projectors as are manufactured by International Projector Corporation. Where hereinafter referred to, Fox shall include not only Fox Theatres but also Fox Film Corporation and/or their subsidiary or affiliated Companies. * * *
"4. For each such projector in excess of the twelve (12) projectors mentioned in Paragraph 1 (b) hereof, Fox agrees to pay to Grandeur in New York Exchange an installation charge of Four Thousand Dollars ($4,000.) for each such projector, payable upon the shipment of each such projector and the further payments hereinafter provided. In the event that the established installation charge made by Grandeur for such projectors is less than Four Thousand Dollars ($4,000.) at any time during the life of this contract, Fox shall be given the benefit of any such decreased charge from the effective date thereof. "5. In addition to any other payments required to *188 be made by Fox hereunder, Fox agrees to pay to Grandeur throughout the term of the license hereby granted, a monthly payment of $175.00/100 in advance. Such payments shall continue for one hundred and twenty (120) months for each projector. Such monthly payment to be made by Fox to Grandeur, however, shall never be in excess of the amount in effect as the established monthly payment at the time when such monthly payment is due. The first six machines furnished, however, shall be free from such monthly payment. * * *
"8. Title to and ownership of any and all projectors at any time furnished hereunder shall remain vested in Grandeur. * * *
"11. * * * In the event of a default in any of the provisions of this agreement at any time during the first two (2) years of the term of his license, the entire balance of monthly payments for the first five (5) years shall be due and payable forthwith at the option of Grandeur * * *. * * *
"16. These licenses to be granted hereunder in respect to each projector shall be for a term of ten (10) years from the day upon which the installation of each respective projector shall have been completed and the projector made available *189 to Fox for use, the last term to expire five (5) years from the date of installation in 1939 of the last projector provided for in Paragraph 1 of this agreement." On July 11, 1929, General Theatres Equipment, Inc. (hereinafter referred to as "G.T.E."), was organized for the purpose of taking over the properties of the International Projector Corporation and other properties intended to be acquired. In 1929 Clarke owned "just over control" stock of G.T.E., and was an officer and controlling stockholder of International Projector Corporation that was taken over by G.T.E.
On July 12, 1929, petitioner was incorporated in the State of Delaware. Its charter contains, inter alia, the following provisions: "TENTH. The following provisions are inserted for the regulation of the business and for the conduct of the affairs of this Corporation, and in further definition, limitation and regulation of the powers of this Corporation and of its directors and stockholders: * * * "(7) A director of this Corporation shall not in the absence of fraud be disqualified by his office from dealing or contracting with this Corporation either as a vendor, purchaser or otherwise, nor in the absence of *190 fraud shall any transaction or contract of this Corporation be void or voidable or affected by reason of the fact that any director, or any firm of which any director is a member, or any corporation of which any director is an officer, director, or stockholder, is in any way interested in such transaction or contract, provided that at the meeting of the Board of Directors or of a committee thereof having authority in the premises, authorizing or confirming said contract or transaction, the interest of such director, firm or corporation is disclosed or made known and there shall be present a quorum of the Board of Directors or of the directors constituting such committee, and such contract or transaction shall be approved by a majority of such quorum, which majority shall consist of directors not so interested or connected. Nor shall any director be liable to account to this Corporation for any profit realized by him from or through any such transaction or contract of this Corporation ratified or approved as aforesaid, by reason of the fact that he or any firm of which he is a member, or any corporation of which he is a stockholder, director or officer was interested in such transaction *191 or contract. Directors so interested may be counted when present at meetings of the Board of Directors or of such committee for the purpose of determining the existence of a quorum. Any contract, transaction or act of this Corporation or of the Board of Directors or of any committee thereof which shall be ratified by a majority in interest of a quorum of the stockholders having voting power at any annual meeting or any special meeting called for such purpose, shall be as valid and as binding as though ratified by every stockholder of this Corporation." * * *
On the same date, a proposal signed by H. L. Clarke was made to petitioner to transfer to it all the properties, business, and assets of Mitchell of California for a stated consideration of $3,100,000 in cash. This proposal refers to a balance sheet annexed thereto, marked Exhibit "A" and made a part thereof. This balance sheet shows a net worth (capital stock and surplus) of $330,480.50 for Mitchell of California, as of December 31, 1928. Clarke's proposal contains a sentence reading: "* * * The undersigned represents to you that at the date of the acquisition by you of said properties, business and assets of said Mitchell *192 Camera Company your financial condition will be at least as good as is reflected on the pro forma balance sheet annexed hereto, marked Exhibit 'A', and made a part hereof." At a special meeting of the board of directors of petitioner held July 16, 1929, the president (H. L. Clarke) occupied the chair. Henry F. Boeger, one of the sellers of Mitchell of California, was elected a vicepresident. The chairman (H. L. Clarke) state it was advisable to open a bank account in the Chase National Bank of the City of New York. Thereupon, a resolution was adopted, authorizing its officers and agents to deposit funds of petitioner in Chase National Bank of the City of New York, and to withdraw the same upon checks or instruments, drawn against the account "and made or signed by H. L. Clarke, President, or signed by S. R. Burns, Vice President, and countersigned by W. C. Michel, Treasurer." The directors further resolved that Chase National Bank be authorized to accept, honor, cash, and pay without limit as to amount, and until written notice of revocation of the authority is actually received by said bank, all checks and other instruments for the payment of money, including all such instruments *193 "payable or endorsed to the personal order of the officer or officers or agent or agents signing on behalf of this Corporation". At this same meeting, a resolution was adopted accepting Clarke's July 12, 1929 proposal to sell the assets of Mitchell of California to petitioner for $3,100,000 and authorizing its proper officers to execute all necessary documents to carry this resolution into effect. Clarke presented to this meeting a proposal by Grandeur (of which Clarke was president) to acquire all of the capital stock of petitioner. This proposal is in the following form: "The undersigned hereby offers to purchase Thirty Thousand (30,000) shares of your capital stock without par value, being all of your authorized capital stock, for the sum of Three Million One Hundred Thousand ($3,100,000.) Dollars in cash, subject to and upon condition that your Corporation acquires all of the assets of Mitchell Camera Company, a California corporation, so that as a result of such acquisition by your Corporation and the receipt by your Corporation of such $3,100,000. in cash the financial condition of your Corporation will be at least as good as the financial condition of Mitchell Camera Company *194 as shown by the latter Company's balance sheet dated December 31, 1928, a copy of which is attached hereto, marked Exhibit 'A'." The Exhibit "A" balance sheet referred to is identical with the balance sheet hereinabove referred to, and shows net worth of $330,480.50. By appropriate resolution, the foregoing proposal of Grandeur was duly accepted by petitioner's board of directors. The signature of H. L. Clarke is appended at the close of these minutes. On July 27, 1929, a deed was signed by Mitchell of California, by H. F. Boeger, president, and George A. Mitchell, secretary, transferring real property in Los Angeles County, Lot 7 of Tract 5274, from that corporation direct to petitioner. Also on July 27, 1929, a deed was signed by Henry F. Boeger, George A. Mitchell, and their respective wives, transferring real property in Los Angeles County, Lots 36 and 38 of the Winnetka Tract, and Lots 7 and 8 of Tract No. 3585, from those individuals direct to petitioner. Both these deeds were recorded September 3, 1929. All of this real estate constituted part of the property included in the contract of June 6, 1929, to be sold to H. L. Clarke by Boeger and Mitchell for the consideration *195 of $1,475,000. On July 27, 1929, assignments of patents and applications for patents were made to petitioner as follows: "(a) Mitchell of California, as sole owner, assigned and transferred its whole right, title and interest in and to 25 patents. "(b) H. F. Boeger and George A. Mitchell transferred their two-thirds interest in an application for patent for an improvement in making composite pictures, applied for January 17, 1927, Serial No. 161,639. "(c) George A. Mitchell sold, assigned and transferred all his right, title and interest in applications for six patents enumerated therein." In all, 30 patents and patent rights on which patents were ultimately obtained, being all the patents and patent rights belonging to Mitchell of California, were transferred to petitioner. Under date of July 29, 1929, a letter was addressed to Continental Illinois Bank and Trust Co., Chicago, Illinois, signed by H. F. Boeger, and by H. F. Boeger, as attorney in fact for George A. Mitchell. According to its terms, H. L. Clarke had theretofore deposited with the bank the contract dated June 6, 1929, under which Boeger and Mitchell were conveying to Clarke or his nominee the real property *196 described in the contract, together with all the assets of Mitchell of California. This letter transmitted the deeds to the real property and the assignments of patents and patent applications above referred to, together with a bill of sale covering the personal property described in the contract of June 6, 1929. The letter, in part, states: "The buyer, H. L. Clarke, has heretofore deposited with you for the undersigned the sum of $100,000.00 and will on or about August 7, 1929, or before, deposit an additional $1,375,000.00 for the undersigned. The above mentioned agreement, dated June 6, 1929, provides for a repurchase agreement to be executed by the buyer for the repurchase of the preferred stock therein mentioned. Since the transaction does not involve any stock this provision for the repurchase agreement will not concern you. "You are hereby instructed to collect for the undersigned from the buyer interest on the above-mentioned sum of money, to-wit: $1,475,000.00 at the rate of seven per cent., per annum, from July 1, 1929, until paid and to hold all of said moneys until further instructions. * * *" Under the terms of the June 6, 1929 contract, the purchasing group was *197 to pay $475,000 in cash and $1,000,000 in preferred stock of a new corporation. Clarke notified Boeger and Mitchell he had decided to pay all cash. The agreement was consummated in cash. The $1,475,000 was not paid to Boeger and Mitchell until the Fall of 1929. On August 1 and 2, 1929, a series of concurrent financial transactions occurred in effectuating the acquisition by Grandeur of all the capital stock in petitioner and in consummating the acquisition by petitioner through Clarke of all the business and assets of Mitchell of California. These transactions are summarized, chronologically set forth, and separately numbered: 1. On August 1, 1929, G.T.E. received $11,400,000 from the sale of its securities. Of this fund, $2,000,000 was used to acquire 50,000 shares, or 50 per cent of capital stock of Grandeur, and $3,000,000 was used to acquire J. E. McCauley Manufacturing Company, Strong Electric Company, Ashcraft Automatic Arc Company and Hall and Connolly, Inc. (hereinafter referred to as "the four lamp companies"). Clarke handled these transactions and had general direction of acquiring this one-half stock interest in Grandeur, and also of acquiring the four lamp companies *198 on behalf of G.T.E.
2. On August 1, 1929, Clarke deposited $5,000.000 to his credit at Chase National Bank, New York, New York, resulting in a balance in his account on that date of $5,025,024.29. 3. On August 1, 1929, H. L. Clarke issued two checks payable to William Fox for the acquisition by Fox of the other one-half interest in Grandeur. These checks drawn on Chase National Bank, signed by H. L. Clarke, are in the respective amounts of $1,625,000 and $375,000, aggregating $2,000,000, and are endorsed by Fox "For Deposit." Clarke's account at Chase National Bank discloses a withdrawal of $2,000,000 on August 2, 1929, bearing a notation "cc" (certified check). 4. William Fox acknowledged receiving the two checks aggregating $2,000,000 from Clarke, but Fox testified that he gave the "Harley Clarke interests" $2,000,000 of checks in exchange. For the two checks from Clarke, Fox by check dated August 1, 1929, paid into Grandeur $1,950,000 toward his one-half interest in its capital stock. Prior to that date he had put up or given Clarke $50,000 as a down payment to apply on the purchase of the assets of Mitchell of California. Fox's check for $1,950,000 is dated August 1, 1929, payable *199 to the order of Grandeur, drawn on National City Bank of New York, and signed for William Fox by his duly authorized agents. The check certified August 2, 1929, by the National City Bank, is endorsed "For Deposit and Credit to Account of Grandeur, Inc." On the same day the Chase National Bank received payment for the account of Grandeur. 5. Clarke's account at Chase National Bank similarly discloses a withdrawal of $1,950,000 on August 2, 1929, in addition to the withdrawal of $2,000,000 on the same date for the checks to the withdrawal of $2,000,000 on the same date for the checks to Fox referred to in step 3 above. 6. Under date of August 1, 1929, Grandeur issued its check, drawn on Chase National Bank, in the amount of $3,000,000, payable to the order of "Mitchell Camera Corporation," and signed "Grandeur, Inc., by H. L. Clarke, President." This check is endorsed "For Deposit & credit to Account of Mitchell Camera Corporation," and was honored by the Chase National Bank August 2, 1929. 7. The bank account of petitioner at Chase National Bank shows a deposit of Grandeur's check in the amount of $3,000,000 on August 2, 1929. On the same date it shows a withdrawal of $3,000,000, *200 representing a check issued to Clarke, leaving no balance. 8. On August 2, 1929, H. L. Clarke's account at Chase National Bank shows a deposit of petitioner's check for $3,000,000. This deposit is credited on the bank statement immediately prior to Clarke's withdrawals on the same date of $2,000,000 and $1,950,000, referred to in steps 3 and 5 above. After the consummation of these check transactions on August 1 and 2, 1929, G.T.E. owned one-half of the capital stock of Grandeur, at a cost of $2,000,000, and William Fox owned the other half at no cost to him. Grandeur, in turn, owned and continued to own all the capital stock of petitioner through the taxable year 1941. The consolidated statements of assets and liabilities as at July 1, 1929, and December 31, 1929, attached to the 1929 consolidated income tax return filed by Grandeur and petitioner, disclose that Grandeur had $4,000,000 capital stock outstanding, represented by 100,000 shares common stock - no-par value, and that Grandeur owned the entire capital stock of petitioner, carried at a book value of $3,100,000. The July 1, 1929 statement of assets and liabilities discloses that Grandeur retained $900,000 undisbursed *201 cash to be used as working capital. The amount of $1,475,000 paid to acquire the business and assets of Mitchell of California was obtained by Clarke from G.T.E. out of its $11,400,000 fund. Clarke had deposited $100,000 on or before July 1, 1929, under the agreement of June 6, 1929, of which Fox had advanced $50,000. Fox was later reimbursed for his $50,000 advance by the check for $2,000,000 dated August 1, 1929, received in exchange for his $1,950,000 check. Clarke paid the balance due under the June 6, 1929 contract, $1,375,000 plus interest, $14,627.58, total $1,389,627.58, on August 24, 1929. Out of G.T.E.'s $11,400,000 fund, $3,000,000 was paid to Clarke to acquire the four lamp companies. To acquire these companies, Clarke paid an aggregate of $1,757,422.93, the individual amounts paid being as follows: J. E. McCauley Manufacturing Co.
$1,131,422.93
Strong Electric Company
316,000.00
Ashcraft Automatic Arc. Co.
150,000.00
Hall and Connolly, Inc.
160,000.00
Total
$1,757,422.93
In addition to the two checks aggregating $2,000,000 which Clarke gave Fox, Clarke also gave Fox 25,000 shares of G.T.E. stock, at $30 per share, with a repurchase agreement, *202 valued at $750,000. G.T.E. had approximately 2,000,000 shares of stock outstanding. Grandeur and petitioner filed a consolidated income tax return for the period July 1 to December 31, 1929, reporting a consolidated net income of $233,796.07 and a tax liability of $25,717.57. This return is sworn to by H. L. Clarke, president. A notation attached thereto reads: "Grandeur, Inc., purchased the entire capital stock of Mitchell Camera Corporation as of July 1, 1929." The statement of assets and liabilities for petitioner "as of July 1, 1929," includes net tangible assets $239,821.05, good will $2,805,157.59, patents $55,021.36, and capital stock outstanding $3,100,000, and is as follows: Assets
Land
$ 35,535.40
Buildings
73,938.48
Machinery and Equipment
91,008.70
Land held for sale
2,050.32
Patents
55,021.36
Good Will
2,805,157.59
Accounts receivable
2,815.00
Inventory
50,896.77
Totals
$3,116,423.62
Liabilities
Capital stock - represented by 30,000
shares common - no par value
$3,100,000.00
Reserve for depreciation
12,760.82
Accounts payable
2,815.00
Accrued payroll
847.80
$3,116,423.62
The December 31, 1929 statement of assets *203 and liabilities of petitioner attached to the 1929 return discloses the values of good will and patents reported at $2,805,157.59 and $52,961.28, respectively. A deduction for depreciation on all assets of $7,765.94 was claimed by petitionr in the return for the period July 1 to December 31, 1929. No adjustment of the depreciation claimed in the return was made by the respondent. The 1930 consolidated income tax return of Grandeur and petitioner reported a net income of $84,213.47. Patents were reported at a net value of $52,961.28 at the beginning of the year; and at a value of $92,768.11 less a reserve for depreciation of $42,028.91, or a net value of $50,739.20 at the end of the year. A value of $2,805,157.59 was reported for "Good Will, Franchise Rights, and Going Concern Value" at both the beginning and end of the year. The deduction for depreciation of patents claimed on the return was $5,347.98 (approximately 1/17th of average basis of $92,518.61). The 1931 consolidated income tax return of Grandeur and petitioner reported patents at a value of $92,768.11 less a reserve for accumulated depreciation of $42,028.91, or a net value of $50,739.20 at the beginning of the year, *204 and at a value of $94,833.11 less a reserve for depreciation of $47,514.16, or a net value of $47,318.95 at the end of the year. A value of $2,805,157.59 was reported for "Good Will, Franchise Rights, and Going Concern Value" at both the beginning and end of the taxable year. The deduction for depreciation of patents claimed on the return was $5,485.25 (approximately 1/17th of $94,833.11). The Revenue Agent in report dated March 3, 1932, and April 10, 1933 proposed deficiencies based on revisions of consolidated net incomes reported for 1930 and 1931, respectively, on issues other than depreciation of patents. These deficiencies and net incomes were subsequently redetermined by allowances to petitioner of additional depreciation of $90,082.52 for 1930, and $89,945.25 for 1931, on the patents acquired at organization, the revised basis, life, amortization allowable, and additional patent depreciation allowances being computed in Revenue Agent's letter to Grandeur, dated January 5, 1934, as follows: Total paid into Grandeur, Inc. by Harley Clarke and William Fox
$4,000,000.00
Paid by Grandeur for net assets of Mitchell Camera Co. of California
3,100,000.00
Balance - Cash remaining in Grandeur
$ 900,000.00
Cost of assets - Mitchell Camera Co. of California as above
$3,100,000.00
Net assets claimed other than good will
294,842.41
Good will and intangibles
$2,805,157.59
Actual value paid by Harley Clark [sic] for total assets per letter to "Continental
Illinois Bank and Trust Co.", Chicago. Ill. Photostatic copy with 1930 revised
schedules
$1,475,000.00
Less Net assets other than goodwill
294,842.41
Considered as value of patents
$1,180,157.59
Life 12.36666 years - amortization allowable
$ 95,430.50
*205 Year 1930
Year 1931
Amortization allowable (above)
$95,430.50
$95,430.50
Amortization allowable per return
5,347.98
5,485.25
Additional
$90,082.52
$89,945.25
Grandeur and petitioner agreed to revised deficiencies computed on the basis of the foregoing additional depreciation of patent allowances, evidenced by the filing of a waiver of restrictions on assessment and collection of deficiencies in taxes amounting to $4,075.84 for 1930, and $471.17 for 1931. This agreement, executed on Treasury Department Form 870, dated December 22, 1933, is signed for Grandeur and Affiliated Companies by "William Fox, Pres." and was accepted by Bureau letter dated April 19, 1934. Prior to the closing of the returns for the taxable years 1930 and 1931, Grandeur and petitioner had filed a consolidated return for 1932 reporting a net loss of $102,819.84. In statements of assets and liabilities attached to this return, the value of good will of petitioner was reported at $1,555,157.59 as at the beginning and end of the year, and the value of patents was reported at $1,344,833.11 as at the beginning, and at $1,345,909.91 as at the end of the year. These figures reflected *206 a write-down of $1,250,000 in the good will account and an identical write-up of that amount in the patent account, compared with 1931 closing balances as follows: Goodwill
Patents
Opening 1932 balances
$1,555,157.59 $1,344,833.11
Closing 1931 balances
2,805,157.59 94,833.11
(Decrease) or Increase
($1,250,000.00)
$1,250,000.00
Petitioner reported details for patents in the depreciation schedule on its 1932 return as follows: Depreciable patent value
$1,345,909.91
Depreciation on patents allowed (or allowable) in previous years
291,787.71
Depreciation deducted taxable year
106,676.73
The depreciation deducted by the petitioner on its 1932 return was not changed by the respondent. In statements of assets and liabilities attached to its 1933, 1934, 1935, 1936, 1937, and 1938 income tax returns, petitioner reported the following values of good will and patents as at the beginning and end of each taxable year: Goodwill
Patents
January 1, 1933
$1,555,157.59
$1,345,909.91
December 31, 1933
1,555,157.59
1,350,363.26
December 31, 1934
1,555,157.59
1,353,084.58
December 31, 1935
1,555,157.59
1,353,816.58
December 31, 1936
1,555,157.59
1,354,146.58
December 31, 1937
1,555,157.59
1,354,636.94
December 31, 1938
1,555,157.59
1,354,710.04
*207 For the taxable years 1933 through 1938, inclusive, the following depreciable patent values, depreciation on patents allowed (or allowable) in previous years, deductions for depreciation of patents, and net losses were reported on income tax returns filed by petitioner: Depreciation
Depreciable
allowed (or
Depreciation
Net
Patent
allowable)
Taxable
Losses
Values
Previous Years
Year
Reported
1933
$1,350,363.26
$398,463.44
$106,885.24
($93,726.56)
1934
1,350,363.26
505,348.68
107,068.24
( 78,281.83)
1935
1,350,363.26
612,416.92
107,139.43
( 65,964.83)
1936
1,354,146.58
719,556.35
107,175.31
( 3,619.65)
1937
1,354,636.94
826,731.66
107,203.46
( 32,630.05)
1938
1,354,710.04
933,935.12
107,223.12
( 17,495.03)
Total
$642,694.80
The depreciation deductions claimed by the petitioner for 1933 to 1938, inclusive, were not changed by the respondent. In statements of assets and liabilities attached to its 1939, 1940, and 1941 income tax returns petitioner reported the following values of good will and patents at the beginning and end of each taxable year: Good will
Patents
January 1, 1939
$1,555,157.59
$1,354,710.04
December 31, 1939
1,555,157.59
1,355,160.04
January 1, 1940
$1,555,157.59
$1,355,160.04
December 31, 1940
1,555,157.59
1,356,145.04
January 1, 1941
None
$ 105,895.54
December 31, 1941
$1,680,021.36
1,198,892.12
*208 For the taxable years 1939, 1940, and 1941, the following depreciable patent values, depreciation on patents allowed (or allowable) in previous years, deductions for depreciation of patents, and net losses were reported in returns filed by petitioner: Depreciation
Depreciable
allowed (or
Depreciation
Net
Patent
allowable)
Taxable
Losses
Values
Previous Years
Year
Reported
1939
$1,355,160.04
$1,041,158.24
$102,171.42
($87,952.61)
1940
1,355,160.04
1,143,329.66
102,228.75
(163,282.50)
1941
1,198,892.12
1,097,000.46
94,605.94
( 7,121.24)
In the notice of deficiency the respondent determined that the basis for computation of allowable depreciation of the group of patents and patent applications acquired on July 27, 1929, was $1,180,157.59; that the said amount is recoverable through depreciation allowances over the average life of the entire group of patents, namely, 12.3666 years from July 27, 1929, and that for the taxable years 1939, 1940, and 1941 petitioner is entitled to deductions of $96,363.16, $50,162.34, and $1,027.78, respectively, as allowable depreciation of patents, computed as follows: Depreciation
Patents
Allowed to
Allowable
Acquired
Cost
12/31/38
1939
1940
1941
7/25/29
$1,180,157.59
$1,035,539.75
$95,430.50
$49,187.34
None
Additions to
12/31/38
15,627.83
5,618.49
917.14
917.14
$917.14
1939
450.00
15.52
31.04
31.04
1940
985.00
26.82
53.64
1941
1,671.70
25.96
Totals
$1,198,892.12
$1,041,158.24
$96,363.16
$50,162.34
$1,027.78
Amount disallowed
5,808.26
52,066.41
93,578.16
Amount deducted in return
$102,171.42
$102,228.75
$94,605.94
*209 Patents
Depreciation
Total to
Acquired
12/31/41
7/25/29
$1,180,157.59
Additions to
12/31/38
8,369.91
1939
77.60
1940
80.46
1941
25.96
Totals
$1,188,711.52
Amount disallowed
Amount deducted in return
H. F. Boeger was elected vice-president of petitioner at a meeting of the board of directors held August 2, 1929. For the year 1930 Boeger received a salary from petitioner of $25,000. H. F. Boeger, George A. Mitchell, and William Fox were elected to the board of directors of petitioner at such meeting. These same three individuals continued to serve as directors at the March 16, 1932 meeting. George A. Mitchell has continued to be employed by petitioner as engineer in charge of production and development. He was employed for a period of approximately five years from the date of incorporation at a salary of $25,000 a year. Messrs. Boeger and Mitchell entered into an agreement not to engage in or become interested directly or indirectly as individuals, partners, directors, officers, or employees, in any motion-picture camera business other than with the buyer, or with petitioner, for a period of five years from the date of the June 6, 1929 agreement. *210 During 1929 H. L. Clarke was the controlling stockholder of G.T.E.; was president of G.T.E., of Grandeur, and of petitioner. For the taxable years 1939 and 1940, petitioner deducted on its returns as ordinary and necessary business expenses the respective amounts of $11,161.88 and $1,574.17 designated "New York Office Expenses," which the respondent disallowed. These expenditures constitute ordinary and necessary business expenses to the extent of $10,255.11 for 1939 and $1,050.65 for 1940. Certain other expenditures made and entered on its books in 1939, 1940, and 1941, in the respective sums of $1,637.49, $1,583.71, and $3,836.61, were ordinary and necessary expenses of the business. Opinion The principal issue is the basis for depreciation of certain patents acquired by petitioner in 1929 upon its organization and included in the aggregate of assets, tangible and intangible, constituting all the property and going business of Mitchell of California. Respondent asserts that basis to be $1,180,157.59, while petitioner contends for a basis of $2,860,178.95. We have set out in our findings the facts in connection with the sale by Mitchell of California of all of its business *211 and its acquisition by petitioner. Briefly stated, these facts are: Clarke and Fox had been associated in some work in developing a wide film camera known as "Grandeur." On May 24, 1929 they agreed in writing that a corporation would be organized under the name of Grandeur, to engage in the business of "purchase, sale, lease and/or license of motion picture projectors, cameras and/or equipment or devices to be used in connection with motion-picture projectors." This company was to pay out of its first earnings $1,000,000 to Fox and $500,000 to Clarke as reimbursement for their "expenditures, labor, overhead, and services for research work in the development of the wide film art." On the next day a second agreement was executed by the parties, evidencing the fact that Clarke was negotiating for the purchase of the business of Mitchell of California. In this instrument it was agreed that the purchase, if effected by him, was to be "for the benefit of a corporation to be organized by us * * * either independently operated by us or shall be a wholly owned subsidiary of Grandeur, Inc." Following this, Clarke negotiated the purchase of all the assets and business of Mitchell of California *212 for an agreed consideration of $1,475,000. The instruments effecting the conveyances were drawn to petitioner herein, and placed in escrow. Clarke deposited $100,000 with the escrow agent and the balance of the purchase price was to be paid upon the delivery of the deeds and assignments. The deposit was furnished equally by Fox and Clarke. It constituted, so far as this record reveals, the only personal funds of these two individuals used in the course of the series of involved transactions which followed. Clarke and Fox caused three corporations to be organized, General Theatres Equipment, otherwise here referred to as G.T.E., Grandeur, and petitioner, Mitchell Camera Corporation. Clarke was president of all three corporations with authority to act for them and disburse their funds. On July 12, 1929, the day of the incorporation of petitioner, Clarke, as an individual, made an offer to petitioner to sell it the assets and business of Mitchell of California for $3,100,000, which offer was accepted. Nothing was done toward closing the transaction with Mitchell of California until August 1, 1929. On that date G.T.E. came into possession of $11,400,000 in cash, from the sale of its *213 securities. Arrangement had been made for its acquisition of several "lamp companies," not here involved. Clarke conducted the arrangement for these acquisitions. The sum of $2,000,000 was paid by G.T.E. into Grandeur, for one-half of the latter's capital stock. Clarke had $5,000,000 of G.T.E. funds paid into his personal bank account, which prior thereto had a balance slightly in excess of $25,000. Thereupon Clarke "gave" Fox a check for $2,000,000 of these G.T.E. funds, and Fox paid this amount into Grandeur, for the remaining one-half of its capital stock. Clarke then had Grandeur give petitioner its check for $3,100,000 of the total of $4,000,000 standing to its credit. For this Grandeur received in return all of the capital stock of petitioner. Thereupon Clarke had petitioner give its check for $3,100,000 to him personally which he used to reimburse himself and Fox for their $100,000 deposit and to pay the balance of $1,375,000 due Mitchell of California for its assets and business. Included in the assets acquired from Mitchell of California were some 30 patents and patent applications upon which patents were later issued. There is no evidence that in the negotiations or at *214 any time in connection with the transactions effecting this purchase was any amount of the total purchase price allocated as paid for these patents. Petitioner now contends that outside of certain tangible assets of Mitchell of California, having an agreed value of $239,821.05, there was nothing of value except the patents conveyed. It insists that Mitchell of California had no good will or other intangible asset of any value and the only thing desired or considered as having value were the patents in question. It argues that the total consideration paid by petitioner, $3,100,000, must be accepted as paid for all of the assets acquired, and to the patents there be allocated a cost of this amount less the agreed value of other tangible assets in the sum of $239,821.05. The record shows this is not the first occasion an investigation has been made to determine the actual basis to petitioner for depreciation purposes of the patents acquired in this transaction. Petitioner in its statement of assets and liabilities attached to its first return filed for the period July 1 to December 31, 1929, reported patents as having a cost basis as of December 31, 1929 of $52,961.28, and good will *215 as having a cost basis of $2,805,157.59. In that return it deducted depreciation on all depreciable assets in the sum of $7,765.94. In the return for 1930, patents were reported as having the same basis, $52,961.28, at the beginning of the year, and $92,768.11 less a reserve for depreciation of $42,028.91, or a net value of $50,739.20 as of the close of the year. A value of $2,805,157.59 was reported for "Goodwill, Franchise Rights and Going Concern Value" at both the beginning and end of the year. The return for 1931 reported the same value as from the first of $2,805,157.59 for good will, franchise rights and going concern value and the patents at a basis of $92,768.11 less a reserve for accumulated depreciation of $42,028.91 or a net value of $50,739.20. These are the respective costs for good will and patents entered on petitioner's records upon their acquisition. Thus, the assumption is not unreasonable that these values reflected its then opinion of the relative value between patents and good will to be used as the basis of allocation to each of the total amount paid for the aggregate. In 1932, upon audit of petitioner's returns for 1930 and 1931, deficiencies were proposed *216 for those years. A controversy arose as to the correct portion of the total contract price allocable to the patents acquired. It is significant also that this controversy took place at a period when the transactions involving the acquisition of these assets and all of the details in connection therewith were fresh in the minds of the parties. All the records made available in the present proceeding were undoubtedly available to the officers and agents of petitioner and the respondent in that investigation. Conditions making for accurate determination existed then rather than now after the lapse of years. As a result of this investigation and the conferences between the representatives of respondent and petitioner, the amount of the total cost to be ascribed to the patents in question was fixed as the amount at which Mitchell of California sold all of its properties, namely: $1,475,000, less $294,842.41, which was fixed as the value of the assets other than good will and patents. The resulting figure, $1,180,157.59, was accepted by petitioner as the basis for computing depreciation upon its patents which, it was further agreed, should be depreciated upon the average life method and *217 upon a life of 12.3666 years. Upon this agreed basis, the depreciation deductible by petitioner was recomputed, resulting in a depreciation allowance of $95,430.50 for each of those years as against the deductions of slightly over $5,000 taken on its returns by petitioner in each of the years. Following this controversy, petitioner in each of the ensuing years used the same basis for depreciation of the patents and took the benefit of the deductions computed thereon. No question was raised as to the correctness of this basis until the taxable year before us. That correctness is now attacked because of the fact that respondent in determining the deficiency for the taxable year 1941 has computed the total depreciation "allowed or allowable" in prior years on the agreed basis of $1,180,157.59 on an average life of 12.3666 years from July 27, 1929, the date of acquisition of the patents. This computation resulted in deductions for 1939, 1940, and 1941 of $96,363.16, $50,162.34, and $1,027.78 as against the deductions taken on the returns of petitioner for those years of $102,171.42, $102,228.75 and $94,605.94, respectively. The basis formerly agreed upon and used during the years having *218 been exhausted, petitioner now seeks a larger basis and a different formula. The burden, of course, is upon petitioner to show error in the basis for depreciation used by respondent in determining the deficiency. It would require very convincing proof here that the basis reached by the parties upon their investigation of the facts at a time when all the circumstances were fresh in their memories and thereafter used for more than 10 years was incorrect. The evidence does not convince us that such basis was not a proper one. We do not agree that the assets and business of Mitchell of California had value represented only by its patents and certain other tangible property. Rather the evidence indicates to us that there was very substantial value in the good will and going business value of that concern. We can not reconcile the statement that at the time the assets of Mitchell of California were acquired it was realized that such company had no good will or going business value with the fact that petitioner entered on its books a total amount of $2,805,157.59 as representing what it had paid for these intangibles. Mitchell of California was a successful corporation operating a very *219 prosperous business. The trade recognized that this company produced the best motion-picture cameras available. At the time of acquisition it had on hand a large backlog of unfilled orders. That its name was recognized in and as having value in the trade is shown, we think, by the fact that it was taken and used by petitioner. Clarke purchased all the business and assets of Mitchell of California for the account of petitioner for an agreed consideration of $1,475,000. That was the amount the seller received. This was an arm's length transaction and the only one, we think, which can be so characterized. The other transactions carried out by Clarke and Fox, through the three corporations they organized, were ones in which the individual as such dealt with himself as president of a corporation. Thus it is evident to us that the price stated in the contract of purchase by petitioner might bear little, if any, relation to what actually was paid for the assets acquired, even though the full amount was paid from the treasury of the acquiring corporation. The manner in which the transaction was consummated does not establish the fact that petitioner actually paid $3,100,000 for the assets *220 it acquired. This record does not convince us that the indirect method used for carrying out the transaction was not merely a means of channeling certain proceeds from the sale of securities by G.T.E. to Clarke and Fox through their control of the corporations they organized. Certainly it is not established that the difference between the purchase price paid Mitchell of California and the $3,100,000 actually paid by Clarke to himself from the funds of petitioner was paid as consideration for the assets. We hold that petitioner has not proved that its actual cost of the assets and business of Mitchell of California was in excess of $1,475,000. In this connection it is noted the contention is made that in addition to this amount large sums were paid as "commissions" in connection with the deals, and that these must necessarily be considered as additional cost. To whom they were paid or for what service rendered, we are not advised. These commissions are vaguely described as aggregating in amount somewhere between three hundred fifty and four hundred thousand. At a hearing before the Senate Committee on Banking and Currency, the evidence was that $100,000 was paid as commissions for the *221 acquisition of not only the assets of Mitchell of California but of other corporations acquired by G.T.E. There was no showing that any part of this $100,000 was paid in connection with the transaction here in question. We think more evidence than this is required upon which to base a finding of additional cost by reason of commissions paid. Petitioner contends that even if we find the actual cost to petitioner of the assets and business of Mitchell of California was only $1,475,000, the computation under which the allocation of cost was originally made in the investigation in 1932 is subject to correction in one respect. It is pointed out that the amount of $1,180,157.59 fixed by respondent as the cost of the patents was arrived at as the difference between $1,475,000 and a value of $294,842.41 assigned to net assets other than good will. Petitioner says it is here stipulated that the value of net tangible assets received from Mitchell of California was only $239,821.05, and consequently a correct computation upon the basis used by the parties at that time would increase by $55,021.36 the base then used for depreciation. This contention can not be sustained. That amount, $294,842.41, *222 was computed as the cost of net assets other than good will, whereas the value of $239,821.05 which petitioner asks be substituted is the stipulated value of net tangible assets. We think the record amply demonstrates that intangible assets of substantial value exclusive of good will were received among the assets acquired from Mitchell of California. One of these intangible assets was the agreements of the two organizers and operators of Mitchell of California not to engage in its line of business for a period of years. Another such asset was its large backlog of contracts. These might well have been worth the difference in the above two figures. Petitioner further contends the formula used by it and by the respondent over all the years in computing allowable depreciation is incorrect. The patents in question, approximately 30 in number, had varying lives. Having been acquired as a whole, no basis existed for the allocation of an individual cost to each. Hence, the formula based on the average remaining life of the patents computed at 12.3666 years was used. It was then apparent such formula would exhaust the depreciation basis of the aggregate of patents prior to the expiration *223 of the longestlived patent. Such formula has been consistently applied. Petitioner has taken depreciation each year upon such basis, thereby exhausting the entire basis prior to the taxable year. It now requests use of a formula approved in Simmons Co., 8 B.T.A. 631. Petitioner argues that the only correct method of computing depreciation exhausts the basis ratably over the entire life of the asset and that this result is accomplished only by use of the formula approved in that case. In that case, the taxpayer had purchased 113 patents in one group. We there approved a deduction for depreciation for each year of that portion of the total cost which bore the same relation to such total cost as the life of the patents which expired in each year bore to the total unexpired life of the group on the date of acquisition. It is urged our decision there must be construed as a disapproval of the average life formula here used. However, in the Simmons case, no dispute existed between the parties as to the formula used. We merely held that the agreed formula there used would be accepted since it appeared to result in that which the statute directed, namely: "reasonable allowance *224 for depreciation." The statute does not provide a formula. It appears to us that the use of the average life formula in the instant case results in a reasonable allowance. That was the view of the parties in adopting and using it consistently over the years. Petitioner in each such year has been allowed the deduction for depreciation thus computed. We have recognized such formula as proper in other cases. Union Metals Mfg. Co., 4 B.T.A. 287; Prophylactic Brush Co., 25 B.T.A. 676; Syracuse Food Products Corp., 21 B.T.A. 865. Having taken this depreciation, petitioner can not now, after the exhaustion of its basis, recompute its allowances according to another formula. Virginian Hotel Corp. v. Helvering, 319 U.S. 523. In determining the deficiencies respondent, disallowed certain deductions denoted "New York Office Expenses" for 1939 and 1940 and "Special Expenses" for 1939, 1940, and 1941. We have found the correct amounts of these items for each year and that they were ordinary and necessary business expenses. It follows that such amounts are deductible. Section 23, I.R.C. The total of these expense deductions *225 claimed for 1939 has been reduced by $100 as constituting not an expense but a donation to the Hebrew Aid Society and no deduction for such contribution is permissible since petitioner had no net income in 1939. Section 23, I.R.C.
Decision will be entered under Rule 50.